G. Bland HOKE, Jr., Appellant (Intervenor),

v.

Peter F. MOYER, Appellee (Petitioner),

v.

BOARD OF COUNTY COMMISSIONERS OF TETON COUNTY, Wyoming, Appellee (Respondent).

BOARD OF COUNTY COMMISSIONERS OF TETON COUNTY, Wyoming, Appellant (Respondent),

v.

Peter F. MOYER, Appellee (Petitioner),

G. Bland Hoke, Jr. (Intervenor).

Nos. 93–46, 93–54.

Supreme Court of Wyoming.

Dec. 21, 1993.

Henry C. Phibbs of Phibbs & Resor, and Marilyn S. Kite of Holland & Hart, Jackson, for Hoke.

Paul O. Vaughn, Teton Deputy Co. Atty., Jackson, for Board of County Com'rs.

Peter F. Moyer, pro se.

Before MACY, C.J., and THOMAS, CARDINE, GOLDEN and TAYLOR, JJ.

CARDINE, Justice.

Appellee, Peter Moyer, sought judicial review of several decisions by the Teton County Board of Commissioners which affected the zoning density of real estate adjoining appellee's property and located in Teton County, Wyoming. The Board of County Commissioners and the potential developer of the affected property, Bland Hoke, appeal from a judgment of the Teton County District Court reversing the County Commissioners' decisions adopting the change in density recommended in the planner's "Memorandum of Decision" and approving the final subdivision plat.

We affirm.

■ Appellant, Teton County Board of Commissioners, raises these issues:

I. Whether the procedures followed and decision of the Commissioners of Teton

County complied fully with the county's regulations.

II. Whether the county's regulations require notice and a public review of proceedings to correct an environmental mapping error.

III. Whether the correction of an environmental mapping error and removal of a zoning designation based on environmental constraints constitutes an "amendment" to the county's regulations.

IV. Whether the court may interpret the county's regulations to require notice and public review contrary to the regulations and the county's clear intentions.

V. Whether the county's procedure for correction of environmental mapping errors violates the enabling act.

VI. Whether the Administrative Procedure Act is applicable to the procedure for correction of environmental mapping errors.

VII. Whether the county's regulations regarding correction of environmental mapping errors meets constitutional due process requirements.

VIII. Whether the petitioner met his burden of proving the matters necessary in order to set aside the decision of the county.

IX. Whether the petitioner has standing as an aggrieved or adversely-affected party to obtain judicial review of the county's action.

X. Whether the decision of the district court is erroneous and should be reversed.

Appellant, Bland Hoke, fails to present a separate statement of the issues as required by W.R.A.P. 7.01(d) and 12.11(b). In previous cases where an appellant has neglected to include a statement of the issues, we have refused to consider the contentions of appellants. *Cline v. Safeco Ins. Cos.*, 614 P.2d 1335, 1337 (Wyo.1980). However, the issues presented by the board comprehensively state the issues which concern Mr. Hoke.

Moyer presents the following issues:

a. Did the Teton County Commissioners comply with the Teton County Comprehensive Plan in re-zoning the applicable land?

b. Did the Teton County Commissioners comply with the State of Wyoming enabling statute in re-zoning the applicable land?

c. Did the Teton County Commissioners comply with the Wyoming Administrative Procedure Act in re-zoning the applicable land?

d. Did the Teton County Commissioners comply with due process requirements in re-zoning the applicable land?

e. Did the Teton County Commissioners comply with the Teton County Comprehensive Plan in permitting subdivision of the applicable land into 3 acre lots?

### FACTS

The Teton County Board of County Commissioners (board) adopted and implemented the Teton County Comprehensive Plan (the plan), effective January 1, 1978. As part of the plan, the board adopted "Land Use and Development Regulations" which "depicts the locations, types and intensities of land uses that are consistent with the objectives of protecting the public health, safety, and welfare, and preventing water pollution and other types of environmental degradation." These land use regulations were adopted pursuant to W.S. 18–5–201 through –202 (1977) to protect "the public health, safety, and welfare and * * * Teton County's priceless environmental quality and scenic beauty," and to maintain and promote a healthy economy and the human environment.

Under these regulations, all the covered land is divided into "land use districts" according to the permissible type of use, e.g., residential/agricultural or commercial, and according to the permissible density, e.g., one unit or dwelling per six acres. Thus, if a "land use district" is designated RA–6, the property may only be used for residential or agricultural purposes and the maximum density allowed is one dwelling or unit per six acres. The boundaries of each "land use district" are depicted on "land use element maps" and, under the plan, these boundaries may be revised through two specific processes, which will be discussed later in this opin-

ion. Placement of the boundaries is based on "environmental data maps" which contain information on geology, hydrology, groundwater and flood hazards.

On September 5, 1990, appellant Bland Hoke (Hoke) published notification of his intent to file for a permit to subdivide 57 acres (John Dodge VII) into 17 lots averaging 3.4 acres in size. At the same time, Hoke applied for a permit to subdivide. John Dodge VII is located adjacent to another subdivision (Wilderness Ranch Estates) where appellee Moyer owns a six-acre lot and lives with his family. At that time, the land use map designated the 57 acres of John Dodge VII as RA–6/3. RA–6/3 allows a maximum density of one dwelling per six acres unless it can be shown that the groundwater level will drop below three feet upon removal of irrigation. Hoke's subdivision permit application, however, stated that the 57 acres of John Dodge VII were designated RA–3, which permitted a maximum density of one dwelling per three acres.

The record does not reflect, directly, why Hoke's subdivision permit application stated that John Dodge VII was RA–3 when the county land use map designated it as RA–6/3. However, a memorandum, prepared by the Teton County Administrator of Planning Services, John Bradley (county planner), provides some insight into the inconsistent land use designations. Evidently, these 57 acres of John Dodge VII were originally designated RA–6 but then changed to RA–6/3 in 1988 when the County adopted new flood maps. There is no record of the process used to accomplish this change. Then, between January 1989 and August 1990, two groundwater observations were made on the 57 acres of John Dodge VII: first, when utility ditches were excavated for the project; and second, when a landscape architect, hired by Hoke, excavated several test pits. Both of these observations revealed that the groundwater level was below three feet, which would permit a density of one dwelling per three acres. Based upon these observations, the county planner decided to revise the land use district boundaries so that the John Dodge VII acreage became RA–3. Hoke, as a county commissioner in addition to being the devel-oper proposing to subdivide the John Dodge VII acreage, likely was aware that the county planner had decided to make the density change and thus designated the acreage as RA–3 in his subdivision permit application.

It was not until October 22, 1990, however, when the county planner drafted a "Memorandum of Decision" in which he stated that the John Dodge VII acreage should be designated RA–3 instead of RA–6/3, that the County attempted to revise the boundary. The county planner forwarded the "Memorandum of Decision" to appellee Moyer, who then objected to the memorandum in a letter dated October 31, 1990. During a board meeting on November 8, 1990, with Moyer present, the commissioners adopted the change in density as recommended by the county planner. Other than sending the memorandum to Moyer, there was no public notice given prior to the board's adoption of this density change.

On December 7, 1990, Moyer petitioned for judicial review in Teton County District Court of the board's decision to adopt the county planner's recommendation to revise the land use district boundary so that the John Dodge VII acreage became RA–3. In addition, on January 17, 1991, Moyer filed a petition for judicial review of the board's decision approving the John Dodge VII final subdivision plat; and on February 13, 1991, he filed a petition for review of the board's decision approving the final plat signature for John Dodge VII. On June 5, 1991, the district court consolidated these three petitions. On January 29, 1993, the district court entered judgment in these consolidated appeals reversing, because of procedural infirmities, the board's decision which adopted the county planner's recommendation changing John Dodge VII to RA–3. Both the board and Hoke appeal from this judgment.

### DISCUSSION

### I. STANDARD OF REVIEW

Wyoming Statute 16–3–114(c) (1990) controls the scope of our review and provides:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions

of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law,

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

## II. STANDING

■ Although raised at the end of its brief, the board asserts that Moyer lacked standing—could not seek judicial review—because he failed to demonstrate that he was "aggrieved or adversely affected" by the board's decision to reassign John Dodge VII as RA–3. The question of who may obtain judicial review of agency actions in district court is controlled by W.S. 16–3–114(a) (1990), which provides:

Subject to the requirement that administrative remedies be exhausted and in the absence of any statutory or common-law provision precluding or limiting judicial review, *any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction,* or any person affected in fact by a rule adopted by an agency, is entitled to judicial review in the district court for the county in which the administrative action or inaction was taken, or in which any real property affected by the administrative action or inaction is located, or if no real property is involved, in the district court for the county in which the party aggrieved or adversely affected by the administrative action or inaction resides or has its principal place of business. [emphasis added]

In other words, "a potential litigant must show injury or potential injury" by "alleg[ing] a perceptible, rather than a speculative, harm resulting from the agency action[.]" *Foster's Inc. v. City of Laramie,* 718 P.2d 868, 872 (Wyo.1986). In the context of zoning law, it has been stated that

[a]n aggrieved or adversely affected person having standing to sue is a person who has a legally recognizable interest that is or will be affected by the action of the zoning authority in question. An individual having standing must have a definite interest exceeding the general interest in community good shared in common with all citizens.

E.C. Yokley, 4 *Zoning Law and Practice* § 24–3 at 194 (4th ed. 1979) (footnote omitted).

■ The board argues that Moyer lacked standing before the district court because his pleadings did not allege "that he is aggrieved or adversely affected." There are no magic words which must be pled to establish standing; a party need not state "I am adversely affected or aggrieved because * * *." In his petition for review of the board's decision to adopt the county planner's recommendation, Moyer alleged that he and his family reside in a subdivision adjacent to the John Dodge VII acreage and that the effect of the board's decision will be to double the density previously permitted. Doubling the density of adjacent property raises a number of perceptible harms for a property owner which are different than the harm to the general public, such as increased traffic and congestion; therefore, Moyer was entitled to judicial review of the board's action by the district court and now by this court.

## III. PROCEDURAL CONCERNS

Procedural infirmities formed the basis of the district court's decision to reverse the board's adoption of RA–3 for the John Dodge VII acreage. The district court concluded that the board's action violated regulatory and statutory procedural requirements. We will address each procedural category separately.

### A. Regulatory Procedure

■ Under the plan, boundaries of land use districts can be revised for the "purpose of correcting an error or attaining greater accuracy" through a non-public process, or the land use district boundaries can be revised through a public process if the revision goes beyond "correcting an error or attaining greater accuracy."

The non-public process provides:

Section 5. * * * In the event that the accuracy of the data shown on an environmental data map that would affect a boundary of a land use district is questioned, the land use district boundaries may be revised on the basis of a new authoritative data made available in accord with the following procedures.

a. A notice of the purported discrepancy shall be filed with the Administrator of Planning Services.

b. From a list of qualified specialists in the appropriate field established by the Board of County Commissioners, the property owner or developer may select and retain a person or firm to make an impartial technical investigation of the condition at issue. Alternately, a specialist or firm not on the official list may be selected, provided that the investigator's qualifications are approved in advance by the Board.

c. If the investigator concludes that revision of the map or maps is justified, a report containing the specific technical information on which the conclusion is based, and showing the location of the revised boundary, shall be filed with the Administrator of Planning Services.

d. If the Administrator of Planning Services determines that the report on the investigation is complete and meets the requirements of this section, the map or maps in question shall be revised to show the changes justified by the investigation. * * *

e. If there is any question as to the completeness of the report or the validity of the information contained therein, the Board of County Commissioners shall be notified, and the map or maps shall not be revised unless the Board so orders following its review of the report on the investigation.

f. A copy of the report on the investigation shall be placed in permanent files of the County.

g. If the investigation justifies revision of the map or maps, the property owner or developers may be reimbursed by the County for the cost of the investigation up to an amount approved by the Board of County Commissioners.

Nothing in this section shall be deemed to provide authority for any change or amendment of the boundary of any land use district or environmental protection district, or of any environmental data map, other than for the purpose of correcting an error or attaining greater accuracy.

Concerning compliance with this non-public procedure, the record reflects that, on February 10, 1989, the county engineer drafted a memo which recommended that certain property west of the Wilderness Estates Subdivision be mapped as having groundwater levels in the three- to five-foot range. Then, based on that memo, on October 22, 1990, the county planner drafted his "Memorandum of Decision" recommending that the John Dodge VII acreage be reassigned as RA–3. On October 31, 1990, Moyer, in writing, objected to the county planner's "Memorandum of Decision" reassigning John Dodge VII as RA–3. Finally, on November 8, 1990, the two memos from the county engineer and the county planner were presented to the board, which adopted the county planner's recommendation and authorized revision of district boundaries to show John Dodge VII as RA–3.

As Moyer suggests, the process which was followed did not comply with the non-public

procedures required by the plan. There is no evidence of a notice of a purported boundary discrepancy as required by paragraph (a) of § 5, nor any evidence demonstrating how a qualified specialist was selected or if the specialist was qualified as required by paragraph (b) of § 5. Other than the brief memo by the county engineer, there appears to be no "report" containing specific technical information gathered through an impartial technical investigation as required by paragraph (c) of § 5.

The board argues that the non-public process outlined in the plan for revising boundaries is "automatic and self-effectuating" and that no formal written notice need be given to the county planner, and instead suggests that the county planner can simply take notice of a discrepancy. Whether or not the county planner can notify himself of a purported discrepancy is unclear, although subsection (b) of the process clearly contemplates that the process will be started by either a developer or a property owner. What is clear, however, is that subsection (a) requires that notice of the discrepancy be filed with the county planner, and there is no evidence of that occurring.

Hoke asserts that the revision of boundaries of land use districts is mandatory once an environmental mapping error is established. The plain language of the plan says otherwise. The first paragraph of the regulatory procedure states: "In the event that the accuracy of the data shown on an environmental data map that would affect a boundary of a land use district is questioned, the land use district boundaries **may** be revised on the basis of a new authoritative data * * *." The use of the term "may" connotes permissive action, not mandatory action. In addition, subsection (e) of § 5 of the regulatory process indicates that the board has discretion to deny the revision.

#### B. Statutory Procedure

The parties agree that the board did not comply with the public process required under the plan for boundary revisions which go beyond "correcting an error or attaining greater accuracy." Both Hoke and the board argue that there was no need to comply with that public process because the revision was made to correct an error or to attain greater accuracy. Whether this land use district boundary change was done simply to "correct an error or attain greater accuracy," or whether the change was of greater magnitude than correcting a mere error made in adopting the RA 6/3 designation in the first instance is a close question. The change in designation changes the entire character of this subdivision. It is a change of considerable magnitude. It is open to serious question whether the initial RA 6/3 designation was the result of error. It certainly was not a mathematical error or error in transcription or inadvertence. One clear purpose for seeking the change was to double the number of building lots and thus double density of the proposed subdivision.

■ The district court held that a change in classification of the magnitude and for the avowed purpose here involved required observance also of procedures prescribed in Wyoming statutes. The district court concluded that the board failed to abide by statutory procedures of notice and comment prior to adopting the change in density for the John Dodge VII acreage. Wyoming Statute 18–5–202 (Cum.Supp.1993), which is the enabling statute for county planning and zoning commissions, provides in part:

(b) The planning and zoning commission may prepare and amend a comprehensive plan including zoning for promoting the public health, safety, morals and general welfare of the unincorporated areas of the county, and certify the plan to the board of county commissioners. *Before certifying its* plan or *amendments thereto to the board the commission shall hold at least one (1) public hearing. Notice of the time and place of hearing shall be given by one (1) publication in a newspaper of general circulation in the county at least thirty (30) days before the date of the hearing.* Any person may petition the planning and zoning commission to amend any zoning plan adopted under the provisions of W.S. 18–5–201 through 18–5–207.

(c) The planning and zoning commission shall prepare recommendations to effectuate the planning and zoning purposes and

certify its recommendations to the board of county commissioners. ***Before adopting the recommendations the board shall hold at least one (1) public hearing. Notice of the time and place of hearing shall be given by one (1) publication in a newspaper of general circulation in the county at least fourteen (14) days before the date of the hearing.*** After public hearing has been held, the board shall vote upon the adoption of the planning or zoning recommendation. No planning or zoning recommendation shall be adopted unless a majority of the board votes in favor thereof. [emphasis added]

Under this statute, the planning and zoning commission is empowered to prepare and amend comprehensive plans and then certify the plan or amendments to the board. However, notice and a public hearing are required before the planning and zoning commission may certify zoning plans and amendments and before the board may adopt commission zoning recommendations. In other words, "the statute mandates a notice and public hearing as conditions precedent to the adoption of any recommendations of the zoning commission, and no action on such recommendations by the board is authorized until the notice and hearing have been affected." *Schoeller v. Bd. of County Comm'rs*, 568 P.2d 869, 874 (Wyo.1977).

In this case the Teton County Zoning and Planning Commission, through its administrator, made a recommendation to the board concerning zoning. Notice and a public hearing were required before that recommendation could be adopted by the board. There is no evidence in the record that the board notified the public that it would be considering the adoption of the planning commission's recommendation to redesignate John Dodge VII to RA–3. The record does reflect that the planning commission notified the public and held public hearings concerning the proposed subdivision of John Dodge VII after the subdivision application had already been redesignated as RA–3. Those subdivision hearings and notifications were not in compliance with the requirements of W.S. 18–5–202.

The procedural requirements W.S. 18–5–202 exist independently of the Teton County Comprehensive Plan's processes for revising district boundaries. Therefore, when the County uses either the non-public process or the public process provided in the plan to revise a district boundary, it is likely that W.S. 18–5–202(c) will require public notice and comment.

## CONCLUSION

We affirm the district court's judgment of January 29, 1993, concluding that the board failed to follow procedures required by the Teton County Comprehensive Plan and because the board adopted a Teton County Planning Commission recommendation without complying with the notice and hearing requirements of W.S. 18–5–202(c).

Affirmed.