2012 WY 158

NORTHERN LARAMIE RANGE FOUN-
DATION, a Wyoming non-profit corpo-
ration, Northern Laramie Range Alli-
ance, LLC, a Wyoming limited liability
company, and White Creek Ranch, LLC,
a Wyoming limited liability company,
Appellants (Petitioners),

v.

CONVERSE COUNTY BOARD OF
COUNTY COMMISSIONERS, and Was-
atch Wind Intermountain, LLC d/b/a Pi-
oneer Windpark I, LLC, and Pioneer
Windpark II, LLC, Appellees (Respon-
dents).

Northern Laramie Range Foundation, a
Wyoming non-profit corporation, and
Northern Laramie Range Alliance, LLC,
a Wyoming limited liability company,
Appellants (Petitioners),

v.

Wyoming Department of Environmental
Quality, Industrial Siting Division, and
Wasatch Wind Intermountain, LLC
d/b/a Pioneer Windpark I, LLC, and Pio-
neer Windpark II, LLC, Appellees (Re-
spondents).

Nos. S–12–0060, S–12–0061.

Supreme Court of Wyoming.

Dec. 14, 2012.

&#9740;20(1)

Representing Appellants: Peter C. Nicolaysen and Pamela M. Brondos of Nicolaysen & Associates, P.C., Casper, Wyoming. Argument by Mr. Nicolaysen.

Representing Appellee Converse County Board of County Commissioners: No Appearance.

Representing Appellee Wasatch Wind Intermountain, LLC: Brent R. Kunz and Lucas Buckley of Hathaway & Kunz, P.C., Cheyenne, Wyoming; John A. Masterson and Alaina M. Stedillie of Rothgerber Johnson & Lyons LLP, Casper, Wyoming. Argument by Mr. Masterson.

Representing Appellee Wyoming Department of Environmental Quality, Industrial Division: Gregory A. Phillips, Wyoming Attorney General; Jay A. Jerde, Deputy Attorney General; Luke J. Esch, Senior Assistant Attorney General. Argument by Mr. Esch.

Before KITE, C.J., and GOLDEN *, HILL, VOIGT, and BURKE, JJ.

KITE, Chief Justice.

[¶ 1] This appeal involves two permitting actions for a wind energy project in the mountains of Converse County. In Case No. S–12–0060, the Northern Laramie Range Alliance, LLC (NLRA), Northern Laramie Range Foundation (NLRF) and White Creek Ranch, LLC ("the objectors") challenge the district court's affirmance of the Converse County Board of County Commissioners' (Board) decision to grant Wasatch Wind Intermountain, LLC's (Wasatch) application for a Wind Energy Conversion System Permit (WECS permit). They also challenge the district court's rulings that NLRA and NLRF did not have standing to appeal the Board's decision. We conclude NLRA has standing, but NLRF does not. We further rule the Board properly granted Wasatch's application for a WECS permit. Consequently, in Case No. S–12–0060, we affirm in part and reverse in part.

[¶ 2] In the second case, Case No. S–12–0061, NLRA and NLRF ("the objectors") challenge the district court's affirmance of the Wyoming Department of Environmental Quality, Industrial Siting Council's (ISC) decision to grant a state industrial siting permit for construction of the project. We conclude the agency acted within its authority, and there is sufficient evidence to justify its decision. Consequently, we affirm the district court's decision in Case No. S–12–0061.[1]

## ISSUES

[¶ 3] The issues in the Converse County case, Case No. S–12–0060, may be summarized as follows:

1. What is the appropriate standard of review of the Board's action?

2. Do NLRF, NLRA and/or White Creek Ranch have standing to appeal?

3. Did the Board act in an arbitrary or capricious manner, abuse its discretion or otherwise act in a manner not in accordance with law when it ruled Wasatch's application was complete and granted it a WECS permit?

 a. Was the traffic study adequate?

 b. Was there sufficient evidence of financial assurances?

4. Were proper notifications given to nearby landowners?

---

* Justice Golden retired effective September 30, 2012.

1. In Case No. S–12–0060, the Converse County Board of County Commissioners is listed as an appellee, but it did not file a brief or otherwise appear. In Case No. S–12–0061, Wasatch and the Industrial Siting Division (ISD) both appeared and filed briefs as appellees.

5. Were the objectors denied due process of law?

 The issues raised in Case No. S–12–0061 are:

1. Was it lawful for the ISC to issue the industrial siting permit subject to Special Condition # 19 which required Wasatch to provide further evidence of its financial resources prior to construction of the project?

2. Did the ISC properly conclude that, with the inclusion of Special Condition # 19, Wasatch had met the financial assurance requirement and was entitled to a permit?

3. Were the ISC's findings that the project will not pose a threat of serious injury to the environment or to the social and economic condition or inhabitants in the affected area supported by substantial evidence?

### FACTS

[¶ 5] These consolidated cases involve two different permits issued to Wasatch allowing it to construct and operate a two-phase wind energy project in the Northern Laramie mountain range near Glenrock in Converse County, Wyoming. The project, called Pioneer Wind Park I and II, includes sixty-two wind turbines, together with support structures and transmission lines, and is to be constructed entirely on private land leased by Wasatch.

[¶ 6] In Case No. S–12–0060, NLRA, NLRF and White Creek Ranch challenge the Board's decision granting Wasatch a WECS permit. The Board held a public hearing on Wasatch's application on April 11, 2011, considered written comments and made its decision at a second public hearing on May 3, 2011. The objectors petitioned the district court for review of the Board's decision. The district court ruled that neither NLRA nor NLRF had standing to appeal, but found that White Creek Ranch did, and, after considering the merits, the district court affirmed the Board's decision.

[¶ 7] In Case No. S–12–0061, NLRA and NLRF challenge the ISC's order granting Wasatch a state industrial siting permit for construction and operation of the wind energy project. Wasatch filed its application for a permit with the ISD on February 2, 2011.[2] The application process was very complex and included information about numerous areas of potential concern, including environment, wildlife, impacts on communities and labor resources, tax projections, financial resources, and others. The ISD reviewed the application and identified some deficiencies, to which Wasatch responded. The ISD thereafter determined that Wasatch's application was complete, and the ISC considered it at a contested case hearing held over several days in May and June 2011. In addition to taking sworn testimony, the ISC also received and considered limited appearance statements from audience members. The ISC granted Wasatch's application and permitted the project; however, it included numerous conditions, some of which had to be fulfilled prior to the commencement of construction. NLRA and NLRF filed a petition for review of the ISC decision with the district court and that court affirmed.

[¶ 8] Both district court decisions were appealed to this Court and we consolidated them for review and decision. Additional facts will be described in our analysis of the issues.

### STANDARD OF REVIEW

[¶ 9] The two cases on appeal come to us from different types of administrative proceedings and that difference affects the standard of review we apply. For both cases, our review is governed by Wyo. Stat. Ann. § 16–3–114(c) (LexisNexis 2011):

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning

---

2. The ISD is a division of the Department of Environmental Quality and provides staff, oversight, technical advice, etc. for industrial siting. Wyo. Stat. Ann. §§ 35–12–103, 35–12–105, 35– 12–110 (LexisNexis 2009). The ISC is an appointed council which acts as the decision-making body for industrial siting. Wyo. Stat. Ann. §§ 35–12–104 through 106 (LexisNexis 2009).

or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 10] The Converse County permit case, No. S–12–0060, proceeded as a public hearing in accordance with Wyo. Stat. Ann. § 18–5–501 through § 18–5–513 (LexisNexis 2010) (statutes pertaining to county permitting of wind facilities) and the Converse County Wind Energy Siting Regulations. In accordance with § 18–5–506 and the county regulations, the proceeding was not a formal trial-type or contested case hearing, but an informal hearing where public comment was solicited. The witnesses were not sworn, comment times were limited and there was no typical cross examination or other indicia of a true adversarial process. After the hearing, the Board issued findings and a decision granting the WECS permit. See § 18–5–507. Because of the informal nature of the hearing, the district court applied the arbitrary and capricious standard of review rather than the substantial evidence standard applicable to factual findings made after formal contested case hearings under *Dale v. S & S Builders, LLC*, 2008 WY 84, 188 P.3d 554 (Wyo.2008).

[¶ 11] The objectors claim the district court erred by using the arbitrary and capricious standard instead of the substantial evidence standard. In *Dale*, we provided a comprehensive review and reiteration of the standards of review for administrative decisions, specifically explaining the differences between the substantial evidence and arbitrary and capricious standards. Our task in applying the substantial evidence test is to

> examine the entire record to determine whether there is substantial evidence to support an agency's findings. If the agency's decision is supported by substantial evidence, we cannot properly substitute our judgment for that of the agency and must uphold the findings on appeal. Substantial evidence is relevant evidence which a reasonable mind might accept in support of the agency's conclusions.

*Id.*, ¶ 11, 188 P.3d at 558 (citations omitted). Further, when conducting a substantial evidence review of the record,

> the deference that normally is accorded the findings of fact by a trial court is extended to the administrative agency, and we do not adjust the decision of the agency unless it is clearly contrary to the overwhelming weight of the evidence on record. This is so because, in such an instance, the administrative body is the trier of fact and has the duty to weigh the evidence and determine the credibility of witnesses.

*Id.*, ¶ 11, 188 P.3d at 558–59.

[¶ 12] The arbitrary and capricious standard also requires the reviewing court to consider the entire agency record to determine whether it reasonably could have made its findings and order based upon all the evidence before it. *Id.*, ¶ 12, 188 P.3d at 559, citing *Newman v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2002 WY 91, ¶ 19, 49 P.3d 163, 170 (Wyo.2002). However, "the arbitrary and capricious standard is more lenient and deferential to the agency than the substantial evidence standard because 'it requires only that there be a rational basis for the agency's decision.'" *Id.*

[¶ 13] Our primary focus in *Dale* was on determining the appropriate standard for reviewing an agency's factual findings after a

contested case hearing. We ruled that, because of the confusion that had inured from using both the substantial evidence and arbitrary and capricious standards for reviewing evidentiary issues in contested case hearings, we would thereafter confine our review of the evidence to the substantial evidence standard. *Dale,* ¶¶ 16–22, 188 P.3d at 559–61. Nevertheless, we also addressed the proper use of the arbitrary and capricious standard of review and discussed its history under the Federal Administrative Procedure Act:

> The judicial review provision of the federal Administrative Procedures Act, 5 U.S.C. § 706, is similar to § 16–3–114(c). Historically under the federal act, the arbitrary and capricious standard was used to review informal adjudications. 33 Fed. Prac. & Proc., Judicial Review § 8334. *Friends of the Bow v. Thompson,* 124 F.3d 1210, 1214–17 (10th Cir.1997), demonstrates the traditional use of the arbitrary and capricious standard of review in adjudicative contexts. In that case, the Tenth Circuit Court of Appeals applied the arbitrary and capricious standard of review in 5 U.S.C. § 706 to review an agency's decision after an informal proceeding involving a timber sale. *See also, Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 416, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). On the other hand, the substantial evidence standard has traditionally been applied to review evidentiary findings after formal, trial-type agency proceedings. 33 Fed. Prac. & Proc., Judicial Review §§ 8333.

*Id.,* ¶ 20, 188 P.3d at 560–61 (footnote omitted).

[¶ 14] As referenced in *Dale,* the Federal Practice and Procedure treatise explains the rationale behind applying separate standards of review to agency actions arising from different types of agency proceedings. The treatise refers to substantial evidence review as "reasonableness review" and explains that "[r]easonableness review is appropriate any time an administrative program requires a high probability of correctness but cannot tolerate judicial duplication of administrative decision making. Traditionally, this combination exists when the decision was made through a formal, trial-like proceeding." 33 Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc. Judicial Review* § 8333 (2006). The arbitrary and capricious standard of review applies to those "administrative schemes in which the courts are to have a lesser role," like when reviewing a decision after an informal agency hearing. *Id.,* § 8334.

[¶ 15] Two federal cases, *Friends of the Bow v. Thompson,* 124 F.3d 1210 (10th Cir. 1997), and *Volpe,* 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971), abrogated on other grounds, *Califano v. Sanders,* 430 U.S. 99, 105, 97 S.Ct. 980, 51 L.Ed.2d 192 (1977), demonstrate the applicability of the arbitrary and capricious standard to informal agency decision making. In *Friends of the Bow,* 124 F.3d at 1214–17, the Tenth Circuit Court of Appeals applied the arbitrary and capricious standard to review a U.S. Forest Service decision allowing a timber sale on national forest lands. That decision was made after an informal proceeding involving agency analysis of a list of alternative actions. Similarly, *Volpe* involved an informal adjudication by the Secretary of Transportation allowing federal funding for construction of a highway through Overton Park in Memphis, Tennessee. The only hearing required by the applicable statutes was conducted by local officials to inform the public about the proposed project and elicit community opinion on the design and route. The United States Supreme Court ruled that the absence of a formal adjudicatory hearing dictated that substantial evidence review was not required and the arbitrary and capricious standard of review was appropriate. *Volpe,* 401 U.S. at 414–15, 91 S.Ct. at 822.

[¶ 16] The objectors direct us to *Gilbert v. Bd. of County Comm'rs of Park County,* 2010 WY 68, 232 P.3d 17 (Wyo.2010), as support for their contention that the substantial evidence standard should apply to the Board's findings in this case even though the hearing was not conducted as a contested case. In *Gilbert,* Park County adopted revised zoning regulations which provided that earlier land use regulations, including allowing light industrial/manufacturing in certain areas, would expire at a certain time unless

particular conditions were met. Gilbert requested a variance to maintain the option of light industrial/manufacturing use on his property. The planning coordinator determined that Gilbert's designation was subject to expiration, apparently rejecting the variance request. The matter proceeded to the Park County Planning and Zoning Commission which held a public hearing and recommended to the board of county commissioners that the variance request be denied. *Id.,* ¶¶ 4–6, 232 P.3d at 19–20.

[¶ 17] The board also held public hearings on the matter, which were documented by tape recordings and board minutes. At the hearings, the board heard the recommendations of the commission, Gilbert's comments, and took oral and written statements from neighbors and a former owner of the property. The board denied the variance request in a written resolution which included findings of fact and conclusions of law. On appeal, the district court ordered a partial remand to "provide a record of the [b]oard's deliberation in denying the variance request." The board then issued a second resolution again denying Gilbert's application. *Id.,* ¶¶ 6–8, 232 P.3d at 19–20. On appeal to this Court, Gilbert argued that the case had morphed into a contested case hearing and he was, therefore, entitled to all of the procedural protections required in such a hearing. *Id.,* ¶ 13, 232 P.3d at 25. We determined the hearing was not a "de facto" contested case hearing because the proceeding was not conducted as such and the applicant did not have a vested property right in the variance. *Id.,* ¶ 14, 232 P.3d at 25.

[¶ 18] In support of their argument in this case, the objectors rely upon our application of the substantial evidence standard in *Gilbert* to review the board's factual determinations as to whether Gilbert had met the variance standards. Without discussing in detail the appropriate standard of review, we applied both the substantial evidence and arbitrary and capricious standards to the same factual findings. *Id.,* ¶¶ 21–22, 232 P.3d at 30–31. The determination of which standard of review applied was not directly at issue in *Gilbert,* and the application of both standards of review simply showed that under either the agency's decision was appropriate. Consequently, *Gilbert* does not mandate that we apply the substantial evidence standard of review to decisions made after informal non-contested case agency proceedings. Given the issue is directly presented in this case and *Dale,* federal precedent and learned treatises all indicate the arbitrary and capricious standard of review applies to administrative proceedings which were not conducted as trial-type adjudications or contested cases, we agree with the district court that the arbitrary and capricious standard of review is appropriate to review Converse County's permit decision.

[¶ 19] The ISC appeal, Case No. S–12–0061, involved a conventional contested case proceeding. As such, we apply the substantial evidence standard of review to the agency's evidentiary determinations.

When the burdened party prevailed before the agency, we will determine if substantial evidence exists to support the finding for that party by considering whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. If the hearing examiner determines that the burdened party failed to meet his burden of proof, we will decide whether there is substantial evidence to support the agency's decision to reject the evidence offered by the burdened party by considering whether that conclusion was contrary to the overwhelming weight of the evidence in the record as a whole. If, in the course of its decision making process, the agency disregards certain evidence and explains its reasons for doing so based upon determinations of credibility or other factors contained in the record, its decision will be sustainable under the substantial evidence test. Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did, based on all the evidence before it.

*Dale,* ¶ 22, 188 P.3d at 561 (citations omitted).

[¶ 20] Even in contested case proceedings, the arbitrary and capricious standard remains available as a " 'safety net'

to catch agency action which prejudices a party's substantial rights or which may be contrary to the other W.A.P.A. review standards yet is not easily categorized or fit to any one particular standard." *Dale*, ¶ 23, 188 P.3d at 561, quoting *Newman*, ¶ 23, 49 P.3d at 172. In all cases, we review an agency's conclusions of law *de novo*, and will affirm only if the agency's conclusions are in accordance with the law. *Moss v. State ex rel. Wyo. Workers' Safety & Comp. Div.*, 2010 WY 66, ¶ 11, 232 P.3d 1, 4 (Wyo.2010); *Dale*, ¶ 26, 188 P.3d at 561–62.

## DISCUSSION

### A. Converse County Permit (Case No. S–12–0060)

#### 1. Standing

[¶ 21] The district court determined that neither NLRA nor NLRF had standing to pursue an appeal from the Board's decision granting a WECS permit to Wasatch. It decided, however, that White Creek Ranch did have standing and proceeded to determine the merits of the appeal. NLRA and NLRF contest the district court's determination that they do not have standing; Wasatch contests the district court's ruling that White Creek does have standing.

[¶ 22] "The existence of standing is a legal issue that we review *de novo*." *Halliburton Energy Services v. Gunter*, 2007 WY 151, ¶ 10, 167 P.3d 645, 649 (Wyo.2007). *See also, Northfork Citizens for Resp. Dev. v. Park County Bd. of County Comm'rs*, 2008 WY 88, ¶ 6, 189 P.3d 260, 262 (Wyo.2008). Standing is a jurisprudential rule that implicates a court's subject matter jurisdiction; thus, it can be raised at any time. *Hicks v. Dowd*, 2007 WY 74, ¶ 18, 157 P.3d 914, 918 (Wyo.2007), citing *Granite Springs Retreat Ass'n, Inc. v. Manning*, 2006 WY 60, ¶ 5, 133 P.3d 1005, 1009–10 (Wyo.2006); *Mutual of Omaha Ins. Co. v. Blury–Losolla*, 952 P.2d 1117, 1119–20 (Wyo.1998).

[¶ 23] In general, the doctrine of standing centers on whether a party "is properly situated to assert an issue for judicial determination." *Cox v. City of Cheyenne*, 2003 WY 146, ¶ 9, 79 P.3d 500, 505 (Wyo.2003). A party has standing when it has a personal stake in the outcome of a case. *Id.* Given this is an agency action, we start with the applicable statutes and rules to define who has an interest in the matter. The Converse County regulations were adopted pursuant to § 18–5–501 *et seq.* Section 18–5–508 states that "[a]ny party aggrieved by the final decision of the board of county commissioners may have the decision reviewed by the district court pursuant to Rule 12 of the Wyoming Rules of Appellate Procedure." W.R.A.P. 12.01 provides judicial review to "any person aggrieved or adversely affected in fact" by agency action. Similarly, § 16–3–114(a) provides that "any person aggrieved or adversely affected in fact by a final decision of an agency in a contested case, or by other agency action or inaction ... is entitled to judicial review...."

[¶ 24] A litigant is "aggrieved or adversely affected in fact" by an agency action if he has a "legally recognizable interest in that which will be affected by the action." *Roe v. Bd. of County Comm'rs, Campbell County*, 997 P.2d 1021, 1023 (Wyo. 2000) (citation omitted). In order to establish standing for judicial review of an agency action, a litigant must show injury or potential injury by " 'alleg[ing] a perceptible, rather than speculative, harm resulting from agency action.' " *Hoke v. Moyer*, 865 P.2d 624, 628 (Wyo.1993), quoting *Foster's Inc. v. City of Laramie*, 718 P.2d 868, 872 (Wyo. 1986). " 'The interest which will sustain a right to appeal must generally be substantial, immediate, and pecuniary. A future, contingent, or merely speculative interest is ordinarily not sufficient.' " *L Slash X Cattle Co., Inc. v. Texaco, Inc.*, 623 P.2d 764, 769 (Wyo. 1981), quoting 4 Am.Jur.2d *Appeal and Error* § 180. Specifically in the context of zoning or land use planning,

> [a]n aggrieved or adversely affected person having standing to sue is a person who has a legally recognizable interest that is or will be affected by the action of the zoning authority in question. An individual having standing must have a definite interest exceeding the general interest in community good shared in common with all citizens.

E.C. Yokley, 4 *Zoning Law and Practice* § 24–3 at 194 (4th ed.1979) (footnote omitted).

*Hoke*, 865 P.2d at 628.

[¶ 25] We have decided a number of cases involving questions of standing in zoning and/or land use actions. In *Hoke*, 865 P.2d at 628, we determined that Mr. Moyer had standing to contest the Teton County Board of County Commissioners' decision allowing a higher density zoning category for a subdivision adjacent to his property. We said that doubling the density on the adjacent property raised "a number of perceptible harms for a property owner which are different than the harm to the general public, such as increased traffic and congestion." *Id. See also Hirschfield v. Bd. of County Comm'rs of County of Teton*, 944 P.2d 1139, 1143 (Wyo. 1997) (holding landowners had standing to challenge an agency decision which would have the effect of doubling the housing density previously allowed on adjoining land). In *Northfork*, the litigants, who lived on property adjacent to a proposed subdivision, established standing by showing potential harm that exceeded the general public's interest. They asserted the proposed land use change would increase the housing density on the adjacent land and violated other county land use regulations, including open space requirements, which could interfere with their scenic views and have adverse impacts on their ability to observe and enjoy the wildlife on their own properties. *Northfork*, ¶¶ 13–14, 189 P.3d at 263–65. In *Cox*, ¶ 14, 79 P.3d at 506, we determined adjoining landowners had standing to challenge a municipality's annexation decision that would increase housing density, leading to increased traffic and congestion and health and safety concerns.

[¶ 26] On the other hand, we determined the potential litigants in *Roe*, 997 P.2d at 1023, failed to establish standing to contest the county commission's authorization of an application to re-subdivide a subdivision. Although they alleged the commission had deviated from the proper administrative process and discussed general concerns about water rights and termination of water and sewer services, they did not spell out how the agency decision specifically threatened them.

[¶ 27] Turning to the appellants in this case, we start with White Creek Ranch because some of the principles applicable to its standing will also apply to our later analysis. White Creek Ranch asserts that it owns land bordering the Wasatch project and the project threatens its scenic views and wildlife habitat and migration. These assertions fall squarely within our ruling in *Northfork*; consequently, we conclude White Creek Ranch has standing as it was aggrieved or adversely affected in fact by the agency action.[3]

[¶ 28] We turn, then, to the two associations that also seek to challenge the Converse County decision, NLRA and NLRF. Because "person" is defined as "any individual, partnership, corporation, association, municipality, governmental subdivision or public or private organization of any character other than an agency," *see* W.R.A.P. 12.02 and Wyo. Stat. Ann. § 16–3–101(b)(vii) (Lexis-Nexis 2011), an association can appeal under the administrative procedures act provided it is "aggrieved or adversely affected in fact" by the agency action. Section 16–3–114(a).

[¶ 29] An association can establish standing on its own or through the associational rights of its members. *Int'l Assoc. of Fire Fighters, Local No. 279 v. Civil Serv. Comm'n of Fire Dept. of City of Cheyenne*, 702 P.2d 1294, 1298 (Wyo.1985), J. Thomas, specially concurring; *Warth v. Seldin*, 422 U.S. 490, 511, 95 S.Ct. 2197, 2211, 45 L.Ed.2d 343 (1975). *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211–12 (citations omitted), provides a template for establishing an association's standing:

> [A]n association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy. Moreover, in attempting to secure

3. White Creek Ranch also asserts standing on the basis that its buildings are on the National Historic Register of Places. It claims the project threatens its ability to "maintain" those buildings. We fail to see the connection between the building designation and possible injury from the project. It is not, however, important because we have already determined that White Creek Ranch has standing to protect its other interests.

relief from injury to itself the association may assert the rights of its members, at least so long as the challenged infractions adversely affect its members' associational rights.

Even in absence of injury to itself, an association may have standing solely as the representative of its members.... [However,] [t]he association must allege that its members, or any one of them, are suffering immediate or threatened injury as a result of the challenged action of the sort that would make out a justiciable case had the members themselves brought suit.

▅▅▅▅ [¶ 30] The record indicates NLRA is a limited liability company with approximately 900 members. It claims standing through injury to its members, particularly Sally Sarvey and White Creek Ranch, and through injury to itself. We have already established that White Creek Ranch has standing. The record includes information and assertions that Kenneth Lay, the owner of the ranch, is a member of NLRA; consequently, the ranch's individual standing also confers standing on NLRA through its associational ties. *See Northfork*, ¶¶ 8, 17, 189 P.3d at 262, 265 (holding an organization had standing because some of its individual members did).

[¶ 31] NLRA also claims standing through another member, Sally Sarvey. One of the bases advanced by NLRA in support of Ms. Sarvey's (and accordingly its own) standing is her concern about the visual and scenic disturbance of the area as a result of the Wasatch project. This concern was raised in an email sent to the county commissioners which stated in part:

We [Michael and Sally Sarvey] understand that the gravel operation on the face of the same mountains has ceased and that reclamation has begun. Many are skeptical that it will be effective but we remain hopeful that it is possible. Everyone views that gravel operation as an ugly scar on an otherwise peaceful scene. Now, as proposed, Phase I of the Wasatch wind farm will stand on the ridge just above the gravel quarry and further add to the Glenrock area disaster with its 30 enormous towers and blinking lights.

In making your decision on whether to permit this farm we beseech you to stand back and put it into the perspective of the future. How will it be viewed by Glenrock residents and all those that pass by? What will you and others think as you are repeatedly reminded of your part in it? What will future generations, including your own descendents, wonder?

[¶ 32] Even putting aside the irrelevant reference to the gravel quarry which apparently has nothing to do with the wind energy project, it is clear from this excerpt that Ms. Sarvey does not make the requisite connection between an individual harm to herself or her property and the project. There is no indication that the wind farm will threaten her with any harm beyond that the general public would incur. These general assertions do not aid her or NLRA in establishing standing.

[¶ 33] Nevertheless, Ms. Sarvey also stated at the public hearing that she owned property "near" land Wasatch leased for its project and she had concerns about the increased traffic from the project. We note her assertion that her property is "near" the project does not precisely fall within our precedent finding standing when the litigants asserted their property "adjoined" or was "adjacent" to the area of proposed action. *See, e.g., Northfork, Hoke, supra.* However, Ms. Sarvey testified about the traffic study and stated that she was concerned about the project construction vehicles causing traffic and safety issues. As we noted in *Cox, Northfork, Hoke,* and *Hirschfield,* concerns about traffic, congestion and safety in the area of one's property are perceptible harms for a property owner that distinguish him or her from the general public. Under these circumstances, we conclude Ms. Sarvey had standing and, her membership in NLRA confers standing on the organization as well.

▅▅▅▅ [¶ 34] Finally, we consider NLRF, a nonprofit corporation which apparently has tax exempt (§ 501(c)(3)) status under the Internal Revenue Code. It has no members and cannot, therefore, establish standing through its members. It must establish that, as an organization, it will potentially be in-

jured by the project. In *Warth*, 422 U.S. at 511, 95 S.Ct. at 2211, the United States Supreme Court explained that "an association may have standing in its own right to seek judicial relief from injury to itself and to vindicate whatever rights and immunities the association itself may enjoy."

 [¶ 35] NLRF does not claim that it owns property adjacent to the project, but argues, instead, that the project will thwart its purposes. The foundation's articles of incorporation recite that it was organized "exclusively for charitable, educational, and scientific purposes." In its pleadings, it makes various representations such as, its "purpose is to sponsor, engage in and promote activities on public and private lands in the Northern Laramie Range, including those areas adjacent to Applicant's project boundaries. The programming, mission and purpose of NLRF would be adversely affected by the destruction of the scenic views and natural beauty, and the degradation of the environment, natural habitat, wildlife and biological resources." These allegations are extremely general and do not show a causal relationship between these perceived threats and the project. There is no description of the foundation's planned programs, where specifically they will be located, or how the programs would actually be harmed by the wind project. In establishing a true interest sufficient to warrant a finding of standing, the "'pleadings must be something more than an ingenious academic exercise in the conceivable.'" *Warth*, 422 U.S. at 509, 95 S.Ct. at 2211, quoting *United States v. SCRAP*, 412 U.S. 669, 688, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). There is nothing in NLRF's claims which separates its asserted injury from that of the general public who enjoys the Northern Laramie Range. As such, NLRF has failed to establish an injury or potential injury sufficient to warrant judicial intervention on its behalf. Nevertheless, because White Creek Ranch and NLRA have standing, we will consider the merits of this appeal.

### 2. *Application Requirements*

[¶ 36] The objectors argue that Wasatch did not meet some of the requirements for an application for a WECS permit. Those re-quirements are found in Wyo. Stat. Ann. § 18–5–503, which states in relevant part:

(a) To obtain the permit required by W.S. 18–5–502, the owner or developer of a wind energy facility shall submit an application to the board of county commissioners. The application shall:

(i) Certify that reasonable efforts have been undertaken to provide notice in writing to all owners of land within one (1) mile of the proposed wind energy facility and to all cities and towns located within twenty (20) miles of the wind energy facility. Notice shall include a general description of the project including its location, projected number of turbines and the likely routes of ingress and egress.

. . . .

(iv) Certify that the proposed wind energy facility will comply with all applicable zoning and county land use regulations, which regulations shall be no less stringent than the standards required by this article.

. . . .

(vii) Provide evidence sufficient for the board of county commissioners to determine if the proposed wind energy facility has adequate legal access. The application also shall describe how private roadways within the facility will be marked as private roadways and shall acknowledge that no county is required to repair, maintain or accept any dedication of the private roadways to the public use. The application also shall include a traffic study of any public roadways leading to and away from the proposed facility and the board of county commissioners may require the applicant to enter into a reasonable road use agreement for the use of county roads prior to construction of the facility.

. . . .

(b) A wind energy facility subject to this article shall meet the requirements adopted pursuant to W.S. 35–12–105(d) and (e) regardless of whether the facility is referred to the industrial siting council pursuant to W.S. 18–5–509 or is otherwise subject to the industrial siting act.

 [¶ 37] Interpretation of statutes and their implementing administrative regu-

lations involves a question of law, which we review *de novo.* *J & T Properties, LLC v. Gallagher,* 2011 WY 112, ¶ 8, 256 P.3d 522, 524 (Wyo.2011) (statutes); *Bailey v. State ex rel. Wyo. Workers' Safety & Comp. Div.,* 2010 WY 152, ¶ 9, 243 P.3d 953, 956 (Wyo. 2010) (administrative regulations). However, it is also "settled that we defer to an agency's interpretation of its own rules and regulations unless that interpretation is clearly erroneous or inconsistent with the plain language of the rules." *Office of State Lands and Investments v. Mule Shoe Ranch, Inc.,* 2011 WY 68, ¶ 11, 252 P.3d 951, 954 (Wyo. 2011), citing *Powder River Basin Resource Council v. Wyo. Dep't of Envtl. Quality,* 2010 WY 25, ¶ 6, 226 P.3d 809, 813 (Wyo.2010). To interpret statutory language:

> [T]he paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

*Dorr v. Smith, Keller & Associates,* 2010 WY 120, ¶ 11, 238 P.3d 549, 552 (Wyo.2010) (citation omitted).

*Mule Shoe,* ¶ 13, 252 P.3d at 954–55. All statutory provisions pertaining to the same subject are considered in pari materia. *Sorensen v. State Farm Auto. Ins. Co.,* 2010 WY 101, ¶ 13, 234 P.3d 1233, 1237 (Wyo.2010). The determination of whether a statute is ambiguous or clear is a matter of law to be determined by the court. *Id.*

### a. Traffic Study

[¶ 38] Section 18–5–503(a)(vii) requires the WECS application to "include a traffic study of any public roadways leading to and away from the proposed facility...." Converse County, Wyoming Wind Energy Siting Regulations, Resolution No. 10–10(4)(h) (hereinafter Resolution 10–10) mirrors the statute. Wasatch's application contained a civil engineering firm's traffic study covering numerous roads, including Mormon Canyon Road and Box Elder Road. The objectors contend the applicant did not comply with the traffic study requirement because it did not include a study of a particular section of Box Elder Road and the traffic study was otherwise deficient.

[¶ 39] Wasatch's study indicates that traffic will be filtered to the project from I–25 and, after leaving the interstate, "the primary route will utilize Mormon Canyon Road, which extends south from Birch Street in Glenrock to the project site. A secondary route utilizing Sunflower Trail, Cold Springs Road, Windy Ridge Road and Box Elder Road may also be utilized, but only under special circumstances. All traffic, including transport, construction, and commuter vehicles will be directed to utilize the Mormon Canyon Road route except in the case of an emergency or if otherwise directed."

[¶ 40] The maps included in the record show that the Mormon Canyon and Box Elder Roads head south from I–25. Box Elder Road intersects with the Mormon Canyon Road in the project area; it then turns away from the project and heads further south away from I–25. Wasatch's traffic study did include Box Elder Road to the intersection with the Mormon Canyon Road but did not include the section that heads south from the project and away from I–25. The objectors claim, therefore, that because the section was not studied, the traffic study was insufficient to meet the requirements of the statute and regulation which require a study of "**any** public roadways leading to and away from the proposed facility." Section 18–5–503(a)(vii); Resolution 10–10(4)(h) (emphasis added).

[¶ 41] The objectors' argument ignores a key part of the clear and unambiguous statutory language—the traffic study requirement is for any roads leading "to and away from the proposed facility." The focus of the statutory language is access (ingress and egress) to and from the project facility.

The legislature obviously intended that the applicant provide information on any route which could potentially be used to access the facility. The objectors' argument that a study is required of any road which somehow connects to a road leading to or from the facility reads words into the statute. "[T]he omission of words from a statute is considered to be an intentional act by the legislature and we will not read words into a statute when the legislature has chosen not to include them." *Morris v. CMS Oil and Gas Co.*, 2010 WY 37, ¶ 28, 227 P.3d 325, 333 (Wyo.2010). It would also impose an impossible burden since most roads intersect with others. We do not interpret statutes in a way that would create an absurd result. *Mule Shoe*, ¶ 19, 252 P.3d at 956.

[¶ 42] The section of Box Elder Road which Wasatch did not study leads south from the intersection with Mormon Canyon Road, away from I–25 which is identified as the key interstate thoroughfare for all traffic to and from the project. The objectors point to no evidence in the record that the unstudied section of Box Elder Road would have any use for, or connection with, the project. As such, even though that section leads away from the project area, it does not go anywhere that would be of any benefit to the applicant or the project. We conclude the clear language of the statute requires the study of any road with some relationship to the project and traffic resulting from the project. The legislature did not intend to impose an overly onerous burden on the applicant to study roads having no actual use in traveling to or from the project. The Board did not act arbitrarily or capriciously by failing to require Wasatch to study the irrelevant section of Box Elder Road.

[¶ 43] The objectors also claim the traffic study had many other deficiencies. Wasatch's traffic study was prepared by a civil engineering firm and contained extensive information, including current road conditions and traffic and intersection volumes and the projected traffic generation from the project. The objectors submitted a review of Wasatch's traffic study prepared by another engineering firm, identifying deficiencies in the study. After the hearing, Wasatch provided more information on Box Elder Road and stated that the deficiencies identified in the objectors' review of the traffic study "are beyond the scope of the traffic study as required by the regulations. These issues will be fully addressed by the Road Use Agreement required between [the Applicant] and Converse County."

[¶ 44] In its decision, the Board found:

A traffic study conducted by Civil Engineering Profession[al]s, Inc. was submitted with the application at Section H.

[Counsel for objectors] submitted critiques of the road study and its amendment submitted by Applicant.... After careful review of the traffic study and the critiques, the Commissioners believe the traffic study and amendment submitted by Applicant is adequate and meets the requirements of the Resolution. The Commissioners expect finalization of the Road Service Agreement prior to the ISC Hearing ... and modification between Applicant and the County as the project progresses.

[¶ 45] Neither the statute nor the regulation define "traffic study" or set out any parameters for the study. Although the objectors' critique found Wasatch's traffic study lacking, the Board was presented with an extensive analysis from Wasatch and accepted it. The Board also referenced a road use agreement which was in the process of being finalized. The statute and regulation specifically allow the board of county commissioners to require the applicant to enter into a reasonable road use agreement for the use of county roads prior to construction of the facility.[4]

[¶ 46] The arbitrary and capricious standard of review requires this Court to give deference to the agency decision and to affirm if the agency reasonably could have made its findings and order based upon all

---

4. The objectors claim that, in order to rely on it, the road use agreement had to be finalized before the application could be granted. The clear language of § 18–5–503(a) and Resolution 10–10 allows the county to require a road use agreement prior to construction, not prior to the permit being granted.

the evidence before it. In fact, we have described "arbitrary" as "willful and unreasoning action, without consideration and regard for the facts and circumstances presented, and without adequate determining principle." *Henderson v. City of Laramie (In re West Laramie)*, 457 P.2d 498, 502 (Wyo.1969). While there is evidence in the record from which two different opinions could be derived, " 'action is not arbitrary or capricious when exercised honestly and upon due consideration, even though it may be believed that an erroneous conclusion has been reached.' " *Id.*, quoting *Miller v. City of Tacoma*, 61 Wash.2d 374, 378 P.2d 464, 474 (1963). Although the objectors claim their critique demonstrated deficiencies in Wasatch's traffic study, they do not analyze the alleged deficiencies on appeal. This is not sufficient to show the Board's decision was unreasonable or willful. The Board considered the evidence before it and the protection afforded by the road use agreement and determined Wasatch had met the statutory and regulatory requirements. In doing so, the Board did not act arbitrarily or capriciously.

### b. *Financial Assurance*

[¶ 47] Section 18–5–503(b) and Resolution 10–10(4)(m) include the financial assurance provision applicable to WECS permit applications and require a wind energy facility to meet the requirements adopted pursuant to § 35–12–105(d) and (e) (LexisNexis 2009). Sections 35–12–105(d) and (e) state in relevant part:

(d) [T]he council shall promulgate rules and regulations prescribing decommissioning and site reclamation standards for facilities permitted under W.S. 35–12–102(a)(vii)(E) and (F). Such standards shall preempt county rules or regulations concerning decommissioning and reclamation and shall be designed to assure the proper decommissioning and interim and final site reclamation of commercial facilities generating electricity from wind and wind energy facilities during construction and operation of the facility, at the end of their useful life, upon revocation of a permit authorizing their operation or upon the

happening of any event which causes operations to cease.

(e) [T]he council shall promulgate rules and regulations prescribing financial assurance requirements for facilities permitted by it pursuant to W.S. 35–12–102(a)(vii)(E) and (F).... These rules and regulations shall preempt county rules and regulations concerning financial assurances and shall be designed to provide adequate assurance that the permitted facilities will be properly reclaimed and decommissioned at the end of their useful life, upon revocation of a permit authorizing their operation or upon the happening of any event which causes operations to cease. The elements to consider when establishing adequate levels of financial assurance shall include credit worthiness, financial strength, credit history, credit rating and any other factors that reasonably bear upon the decision to accept a financial assurance. The financial assurance may be in any form acceptable to the council and may include a corporate guarantee, letter of credit, bond, deposit account or insurance policy.

[¶ 48] Subsection (e) contains the financial assurance requirement at issue here. Application of this provision in this case is somewhat difficult, because although it was adopted during the 2010 Wyoming legislative session effective July 1, 2010, the ISC did not finally promulgate the rules mandated by the statute until after Converse County had granted Wasatch's permit. *See* Wyoming Department of Environmental Quality, Rules and Regulations of the Industrial Siting Council (hereinafter ISC Rules), Chap. 1, § 9(p), effective May 31, 2011. The parties make much of this procedural timeline—the objectors argue Wasatch was required to comply with the proposed rules, while Wasatch states that it was not. In fact, however, the objectors' specific complaints about Wasatch's financial assurance evidence do not address the rules. Consequently, this issue can be resolved without considering the lack of final promulgated rules at the time of the board decision.

[¶ 49] Responding to Resolution 10–10(4)(m), Wasatch stated in its WECS application:

To finance the construction, operation, decommissioning and reclamation of the Projects, Pioneer Wind Park ... will join with a financial partner that not only understands the nuances of wind farm financing, but also has extensive experience operating wind energy facilities and other energy assets. This financial partner will have the financial capability and be able to provide the financial assurances required under the Industrial Siting Act.

Wasatch included a reclamation and decommissioning plan with its application and Sanjay Bhasin, a representative of its financial partner, Edison Mission Energy, spoke at the public hearing. The Board found the financial assurance acceptable based upon the applicant's statement that it would join with the financial partner, the Edison representative's statement, and Wasatch's testimony about the proposed ISC requirement "that Applicant must post a sufficient bond to insure project decommissioning and reclamation." The Board added: "Additionally, the ISC staff has approved the financial assurances provided by Applicant."

[¶ 50] The objectors assert Wasatch's financial assurance evidence was insufficient because it was relying on a financial partner instead of its own financial resources. We will discuss aspects of the financial assurance requirements in more detail in Case No. S–12–0061; however, at this juncture we note there is nothing in § 35–12–105(e) which requires the applicant to provide such assurances based upon its own financial resources and without relying on partners or investors. Reading subsections (d) and (e) together, it is clear the legislature's intent was to assure that projects will be properly reclaimed and decommissioned. The legislature made no statement about who had to provide the financial assurance that such reclamation and decommissioning would take place. Thus, there was nothing arbitrary or capricious about the Board relying upon Wasatch's evidence regarding its financial partner to meet the assurance requirement.

[¶ 51] The objectors also challenge the sufficiency of Edison's financial assurances. Section § 35–12–105(e) provides: "The elements to consider when establishing adequate levels of financial assurance shall include credit worthiness, financial strength, credit history, credit rating and any other factors that reasonably bear upon the decision to accept a financial assurance." Mr. Bhasin, the Managing Director for the Wind Energy Development Group for Edison Mission Energy, appeared at the public hearing. He described his company's financial resources and wind energy assets in several states. Mr. Bhasin stated that his company was one of the top "five or six U.S. companies in the wind energy sector." He indicated, although Edison had not irrevocably committed to acquire the Wasatch project, that was its intent once the project was permitted. He also stated that considerable planning efforts had already been made. Under the arbitrary and capricious standard of review, this evidence provided a rational basis for the Board to accept Wasatch's financial assurance.

[¶ 52] Moreover, the evidence also included Wasatch's reclamation and decommission plan, which is part of the scope of the financial assurance requirement. The plan included lease conditions Wasatch had negotiated with the private land lessors mandating the lessee to meet reclamation requirements and "establishing individual removal bonds." Wasatch also committed to provide guaranteed funds to cover the costs of decommissioning as required by the ISC.[5]

[¶ 53] The objectors also fault the Board for stating that the "ISC staff" had approved the financial assurances provided by Wasatch as a basis for approving the permit. Wasatch admits this statement was in error as the ISC had not yet made its decision and, as will be discussed in more detail, *infra*, the ISC ended up imposing a condition requiring further financial assurances prior to construction. That aspect of the Board's deci-

---

**5.** The objectors maintain the evidence was flawed because Mr. Bhasin stated the permittee would not need to post a bond prior to construction. His statement seems to be a simple misunderstanding. In fact, as Wasatch maintained, the ISC conditioned the permit by requiring the permittee to provide a bond or similar security of over $18,000,000 for decommissioning and reclamation **before** the start of construction.

sion was simply an alternative or additional basis to support its ruling. The other evidence relied upon by the Board in making its decision was sufficient to justify its decision. A rational basis clearly existed to support the Board's decision that Wasatch met the financial assurance requirements for issuance of the WECS permit.

### 3. Notification

[¶ 54] The objectors claim Wasatch failed to properly notify and identify as non-participating landowners nearby property owners, Chester and Jennifer Hornung and White Creek Ranch, and failed to identify them as adjoining property owners in the project plan as required by the county regulations. Resolution 10–10(4)(a) requires the applicant to include in its application:

 a. Certification that demonstrates reasonable efforts have been undertaken by the applicant to provide notice, in writing, to all owners of land within one (1) mile of the proposed WECS Project, and to all cities and towns located within twenty (20) miles of the WECS Project. Notice shall include a general description of the project including its location, anticipated dates for commencement of construction and operations, projected number of turbines and the likely routes of ingress and egress.

 Additionally the following shall be submitted:

 . . . .

 ii. The name(s), address(es), and phone number(s) of all non-participating adjacent property owner(s) within one (1) mile of the WECS project site[.]

[¶ 55] Resolution 10–10(4)(i) requires the applicant to provide a project plan with certain information, including "[a] site plan for the installation of a WECS Project showing the planned location of each WECS tower, primary structure(s), property lines (**including identification of adjoining properties**), setback lines, public and private access roads and turnout locations, substation(s), electrical cabling from the WECS tower to the substations, ancillary equipment, transmission lines, and layout of all significant structures within the geographical boundaries of any applicable setback." (emphasis added). Subsection

(i) also acknowledges that the project plan may change and simply requires that after the permit is granted, the "project plan be revised to show the final location of all facilities." Resolution 10–10(4)(i).

[¶ 56] The Board made the following finding regarding the certification requirement:

 In its application, Applicant provides a certification in Appendix 1. In Section A, Applicant provides a list of all owners of land located within one mile of the WECS Project, and all cities located within 20 miles, and proof thereof that they were notified.

 At the public hearing, and by supplementary letter (Ex. 14) Jennifer Hornung stated that she should have been notified because she lives within one mile of the [land] leased ... by Applicant. At the public hearing, Applicant replied that Mrs. Hornung is well outside of the project boundaries. Nor is the lease land that she is referring to within the project boundary. Applicant also testified that a representative of the project had talked with Mrs. Hornung and her husband about the details of the project and offer[ed] more information if she would contact them. (Exh. 18) In Mrs. Hornung's letter submitted after the hearing to the Commissioners, she stated she was within a mile of the leased land and that should put her within the boundary of the project. She rejected the assertion that anyone had substantively talked with her when she went to an open house for the wind project in the fall.

 The Commissioners asked Holly Richardson, the County Interim Special Projects Officer, and one familiar with GIS locations, to verify the distance from Mrs. Hornung's residence and the distance to the project boundary listed in the application. She related to the Commissioners at the meeting this day that the distance is approximately 2.5 miles from Mrs. Hornung's residence to the project boundary, and approximately 1.75 miles from the White Creek Ranch.

 A review of the maps and testimony by Wasatch at the public hearing indicated that Mrs. Hornung's residence was over

two miles from the perimeter of the project, though within one mile of the Stratton property which is leased by Applicant, but not included in the project.

Some confusion seems to exist between the project boundary and the larger area whereby Applicant has also leased property. (See Ex. 30). However, based upon all evidence heard and received, the Commissioners believe that Applicant has provided the necessary certification and accompanying information to believe that the necessary property owners, cities and subdivisions were notified as required under the Resolution.

The Board also found Wasatch's project plan to be sufficient, while noting that the resolution allows changes to be made in the project plan as long as it is revised to show the final location of all facilities.

[¶ 57] As the Board's decision indicates, there was confusion over where the one mile perimeter for notification purposes should be measured from or, in other words, the location of the "project." Wasatch measured the notification distance from the closest turbine and the objectors claim this was improper because a WECS project site is not a turbine, but "a facility with a variety of required components—a system of multiple turbines, power collecting, storing and transmitting systems, operations and maintenance buildings, stations, roads, infrastructure, etc." Even if we were to accept that argument, the objectors point to no evidence that the Hornung residence is within a mile of any of those components. The objectors' evidence showed the residence was within one mile of land leased by Wasatch but not within one mile of any of the project components. As such, the objectors' argument is not even internally consistent. Moreover, it is clear from reviewing the record that the Board correctly considered the conflicting evidence regarding the distances and rationally concluded the Hornungs were not within one mile of the project.

[¶ 58] The objectors also contend White Creek Ranch should have received notification and been identified as a non-participating landowner because it owns property in a section which was listed in the application as part of the legal description of Wasatch's project and was adjacent to the "study area boundary." The project legal description section of the application lists the "leased private lands in and around the project area and transmission line corridor." It does not purport to include only the actual area of the project. The study area boundaries do not have relevance to the regulation which requires notification to landowners within one mile of the proposed WECS project. The objectors simply do not make the requisite showing that the White Creek property was within one mile of the actual project.

[¶ 59] For the same reasons that we conclude the notification was sufficient, we also conclude the project plan was adequate even though it did not identify White Creek Ranch or the Hornungs as adjoining property owners. Resolution 10–10(4)(i) requires a project plan to include a site plan for the installation of the WECS project including planned location of the project components. One of the requirements is a showing of property lines, including identification of adjoining properties. As the evidence described above makes clear, the Hornung and White Creek properties do not "adjoin" the project site.

[¶ 60] In addition, in previous cases we have addressed contentions that an applicant failed to comply with statutory notice requirements and stated that "an error must be prejudicial and affect the substantial rights of the appellant to warrant reversal." *Pfeil v. Amax Coal West, Inc.*, 908 P.2d 956, 960 (Wyo.1995), citing *Grams v. Environmental Quality Council*, 730 P.2d 784, 787 (Wyo.1986). In *Pfeil*, we determined that, although Amax failed to mail notice of a proposed mine permit revision to an opponent's current address, she was not deprived of notice because she "had actual notice, timely filed an objection, and did not make a request for a continuance." *Id.* The Hornungs and White Creek Ranch learned of the application, appeared at the public hearing, and submitted additional information to the Board. Given they had actual notice of the proceeding and participated in it, they have failed to demonstrate prejudice even if they

did not receive any required legal notice. *Id.*[6]

### 4. Procedural Due Process

[¶ 61] The objectors claim the Board violated their right to procedural due process by accepting and relying on information Wasatch submitted after the public hearing without giving them reasonable notice and meaningful opportunity to be heard. In particular, they take issue with their inability to respond to Wasatch's assertion that the ISC staff had accepted their financial assurances and a post-hearing letter provided by Wasatch. They also assert their due process rights were violated when the Board directed that a county employee provide information about the distances from the project to the Hornung and White Creek Ranch properties.

[¶ 62] Wyo. Const. Art. 1, § 6 states: "No person shall be deprived of life, liberty or property without due process of law." Procedural due process principles apply in the administrative context and "require reasonable notice and a meaningful opportunity to be heard before governmental action may substantially affect a significant property interest." *Pfeil,* 908 P.2d at 961. However, as the United States Supreme Court stated in *Morrissey v. Brewer,* 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972): "Once it is determined that due process applies, the question remains what process is due.... [D]ue process is flexible and calls for such procedural protections as the particular situation demands."

[¶ 63] Section 18–5–506 mandates the procedure to be applied in WECS permit cases and required the Board to "hold a public hearing to consider public comment" and accept written comment for not less than forty-five days after determining that the application is complete. There is no allegation that the Board failed to follow the statutory procedure. Although the objectors claim they should have had an opportunity to respond to submissions Wasatch made after the hearing, the statute did not require that.

[¶ 64] With regard to the objectors' specific claims, we have already addressed the Board's acceptance of Wasatch's assertion that the ISC staff had accepted their financial assurance. As we stated above, that assertion was incorrect but ultimately unnecessary to the Board's decision; consequently, the objectors' inability to respond to it is irrelevant. Wasatch's post-hearing letter addressing the public comments at the hearing fell within the written comment period allowed by the statute, and the Board did not violate due process by allowing or considering those additional comments. Besides, the objectors also presented additional information after the hearing which is part of the evidentiary record.

[¶ 65] Finally, the objectors claim their due process rights were violated when the Board directed a county employee to measure the distance from the project to the Hornung and White Creek Ranch properties and considered the information at the May 3, 2011, hearing where it granted the permit. They point to no legal authority prohibiting the Board from doing so. Moreover, the results reported by the county employee were consistent with information Wasatch had already presented to the Board. As we explained in detail earlier, the parties disagreed over where the one mile notification radius should be measured from-the project site or the leased land. The measurements provided by the county employee did not change that underlying dispute. The objectors have simply made no showing that their right to due process was violated or that they were prejudiced by the procedures employed by the Board. *See, e.g., Greene v. Wyo. Bd. of Chiropractic Examiners,* 2009 WY 42, ¶ 39, 204 P.3d 285, 296 (Wyo.2009).

### B. ISC Permit (Case No. S–12–0061)

[¶ 66] The ISC issued a permit to Wasatch for Pioneer Wind Park I and II under the Industrial Development Information and Siting Act, Wyo. Stat. Ann. § 35–12–101 through § 35–12–119 (LexisNexis 2010) (In-

---

6. The objectors also assert the mineral interest owner certification in Wasatch's application was not accurate. This assertion is made entirely without reference to any particular mineral interest owner who did not receive notice and there is absolutely no showing of prejudice to anyone. As such, we summarily reject it under *Pfeil.*

dustrial Siting Act). NLRA and NLRF[7] (hereinafter referred to as "the objectors") challenge the ISC determination that Wasatch met certain requirements for a permit. Section 35–12–109 (LexisNexis 2010)[8] set out extensive permit application requirements and stated in relevant part:

(a) An application for a permit shall be filed with the division, in a form as prescribed by council rules and regulations, and shall contain the following information:

(i) The name and address of the applicant, and, if the applicant is a partnership, association or corporation, the names and addresses of the managers designated by the applicant responsible for permitting, construction or operation of the facility;

(ii) The applicant shall state that to its best knowledge and belief the application is complete when filed and includes all the information required by W.S. 35–12–109 and the rules and regulations, except for any requirements specifically waived by the council pursuant to W.S. 35–12–107;

(iii) A description of the nature and location of the facility;

(iv) Estimated time of commencement of construction and construction time;

(v) Estimated number and job classifications, by calendar quarter, of employees of the applicant, or contractor or subcontractor of the applicant, during the construction phase and during the operating life of the facility ...

(vi) Future additions and modifications to the facility which the applicant may wish to be approved in the permit;

(vii) A statement of why the proposed location was selected;

(viii) A copy of any studies which may have been made of the environmental impact of the facility;

(ix) Inventory of estimated discharges including physical, chemical, biological and radiological characteristics;

(x) Inventory of estimated emissions and proposed methods of control;

(xi) Inventory of estimated solid wastes and proposed disposal program;

(xii) The procedures proposed to avoid constituting a public nuisance, endangering the public health and safety, human or animal life, property, wildlife or plant life, or recreational facilities which may be adversely affected by the estimated emissions or discharges;

(xiii) An evaluation of potential impacts together with any plans and proposals for alleviating social and economic impacts upon local governments or special districts and alleviating environmental impacts which may result from the proposed facility. The evaluations, plans and proposals shall cover the following:

(A) Scenic resources;

(B) Recreational resources;

(C) Archaeological and historical resources;

(D) Land use patterns;

(E) Economic base;

(F) Housing;

(G) Transportation;

(H) Sewer and water facilities;

(J) Solid waste facilities;

(K) Police and fire facilities;

(M) Educational facilities;

(N) Health and hospital facilities;

7. Wasatch and the ISD do not contest the objectors' standing in Case No. S–12–0061. The Industrial Siting Act, Wyo. Stat. Ann. § 35–12–111 (LexisNexis 2010) specifically allowed "any nonprofit organization with a Wyoming chapter, concerned in whole or in part to promote conservation or natural beauty, to protect the environment, personal health or other biological values, to preserve historical sites, to promote consumer interests, to represent commercial and industrial groups, or to promote the orderly development of the areas in which the facility is to be located" to be a party to the ISC permit process. The provision was amended in 2011 to include agricultural groups. Laws 2011, ch. 146, § 1, eff. July 1,

2011. Wyo. Stat. Ann. § 35–12–114 allows "[a]ny party as defined in W.S. 35–12–111 aggrieved by the final decision of the council on an application for a permit [to] obtain judicial review." *See also, Laramie River Conservation Council v. Industrial Siting Council*, 588 P.2d 1241, 1246 (Wyo.1978).

8. The 2010 version of the relevant statutes applies in this case because the application was submitted and the hearing was held prior to the effective date of changes to some of the provisions in 2011 and 2012.

(O) Water supply;

(P) Other relevant areas[;]

(Q) Agriculture;

(R) Terrestrial and aquatic wildlife;

(S) Threatened, endangered and rare species and other species of concern identified in the state wildlife action plan as prepared by the Wyoming game and fish department.

(xiv) Estimated construction cost of the facility;

(xv) What other local, state or federal permits and approvals are required;

(xvi) Compatibility of the facility with state or local land use plans, if any;

(xvii) Any other information the applicant considers relevant or required by council rule or regulation;

(xviii) A description of the methods and strategies the applicant will use to maximize employment and utilization of the existing local or in-state contractors and labor force during the construction and operation of the facility;

(xix) Certification that the governing bodies of all local governments which will be primarily affected by the proposed facility were provided notification, a description of the proposed project and an opportunity to ask the applicant questions at least thirty (30) days prior to submission of the application;

(xx) For facilities permitted pursuant to W.S. 35–12–102(a)(vii)(E) or (F), a site reclamation and decommissioning plan, which shall be updated every five (5) years, and a description of a financial assurance plan which will assure that all facilities will be properly reclaimed and decommissioned. All such plans, unless otherwise exempt, shall demonstrate compliance with any rules or regulations adopted by the council pursuant to W.S. 35–12–105(d) and (e);

(xxi) Information demonstrating the applicant's financial capability to construct, maintain, operate, decommission and reclaim the facility.[9]

(footnote added).

[¶ 67] Section 35–12–113 stated the standards that must be satisfied for the ISC to grant a permit and provided in pertinent part:

(a) Within forty-five (45) days from the date of completion of the hearing the council shall make complete findings, issue an opinion and render a decision upon the record, either granting or denying the application as filed, or granting it upon terms, conditions or modifications of the construction, operation or maintenance of the facility as the council deems appropriate. The council shall not consider the imposition of conditions which address impacts within the area of jurisdiction of any other regulatory agency in this state as described in the information provided in W.S. 35–12–110(b), unless the other regulatory agency requests that conditions be imposed. The council may consider direct or cumulative impacts not within the area of jurisdiction of another regulatory agency in this state. The council shall grant a permit either as proposed or as modified by the council if it finds and determines that:

(i) The proposed facility complies with all applicable law;

(ii) The facility will not pose a threat of serious injury to the environment nor to the social and economic condition or inhabitants or expected inhabitants in the affected area;

(iii) The facility will not substantially impair the health, safety or welfare of the inhabitants; and

(iv) The applicant has financial resources to construct, maintain, operate, decommission and reclaim the facility.[10]

9. Section 35–12–109 has since been amended by the legislature. In particular, subsection (a)(xxi) was amended in 2012 to state: "Information demonstrating the applicant's financial capability to decommission and reclaim the facility. For facilities meeting the definition of W.S. 35–12–102(a)(vii)(E) the information shall also demonstrate the applicant's financial capability to construct, maintain and operate the facility[.]" 2012 Wyo. Laws, Chap. 50, § 1, effective July 1, 2012.

10. Section 35–12–113(a)(iv) was changed in 2012 to state: "(iv) The applicant has financial resources to decommission and reclaim the facility. For facilities meeting the definition of W.S. 35–

(b) No permit shall be granted if the application is incomplete.

(c) If the council determines that the location of all or part of the proposed facility should be modified, it may condition its permit upon that modification, provided that the local governments, and persons residing therein, affected by the modification, have been given reasonable notice of the modification.

(d) The council shall issue with its decision, an opinion stating in detail its reasons for the decision. If the council decides to grant a permit for the facility, it shall issue the permit embodying the terms and conditions in detail, including the time specified to commence construction, which time shall be determined by the council's decision as to the reasonable capability of the local government, most substantially affected by the proposed facility, to implement the necessary procedures to alleviate the impact. A copy of the decision shall be served upon each party.

. . . .

(h) For applicants subject to W.S. 35–12–105(e), a permit may be issued conditioned upon the applicant furnishing a bond or other financial assurance acceptable to the division in an amount determined by the director to cover the cost of decommissioning and reclaiming the facility.

(footnote added).

### 1. Financial Assurance

[¶ 68] Sections § 35–12–109(a)(xx) and (xxi) and § 35–12–113(a)(iv) and (h) (quoted above) and § 35–12–105(e) (quoted in Paragraph 47, *supra* ) addressed the financial assurance requirement for industrial siting permits. After the contested case hearing, the ISC issued the following conclusions concerning Wasatch's financial assurance evidence:

[T]his Council notes that Wasatch Wind did not attempt to establish its own financial resources to demonstrate it[s] ability to construct, maintain, operate, decommission and reclaim the facility. Rather, the Applicant relied upon Edison Mission

Wind's financial capability to satisfy the financial assurance requirement of Wyo. Stat. Ann. § 35–12–113(a)(iv). This Council is aware that Edison Mission Wind is not contractually bound to exercise its option to purchase the Projects. The Council is further aware that these types of financing arrangements are standard in the industry. Nevertheless, considering the testimony of [Sanjay] Bhasin [representative of Edison Mission Wind], this Council finds that further assurance of financial capability must be provided before construction can begin so that the Council is assured that Wasatch Wind has actually obtained sufficient assurances of financial resources. Therefore, the Council finds it necessary to impose Special Permit Condition # 19 which requires sufficient financial assurances prior to construction.

With that conclusion, the ISC granted Wasatch's application for a permit, stating "with the imposition of the following conditions, . . . [t]he Applicant has the financial resources to construct, maintain, operate, decommission and reclaim the facility." Special Condition # 19 states:

Prior to the start of construction, Permittee shall provide evidence acceptable to the Council, upon recommendation of the Industrial Siting Division, that the Permittee has obtained sufficient financial resources to construct, maintain, operate, decommission and reclaim the facility. If sufficient financial resources are not obtained within two years, the Permit shall expire.

[¶ 69] The objectors claim first that the ISC erred by allowing Wasatch to provide the financial assurance through another party, Edison Wind Energy (Edison). They insist the applicant must provide proof that it, alone, had the financial means to construct, maintain, operate, decommission and reclaim the facility. The objectors made a similar argument in Case No. S–12–0060; however, resolution of the issue in this case requires more detailed analysis of the relevant provisions of the Industrial Siting Act. Section 35–12–109(a)(xxi) required the appli-

12–102(a)(vii)(E) the council shall also be required to find the applicant has financial re-

sources to construct, maintain and operate the facility."

cation to include "[i]nformation demonstrating the applicant's financial capability to construct, maintain, operate, decommission and reclaim the facility." In order to grant the application, the ISC was required to determine "[t]he applicant has financial resources to construct, maintain, operate, decommission and reclaim the facility." Section 35–12–113(a)(iv).

[¶ 70] In accordance with our statutory construction principles, we start with the plain language of the statutes. Section 35–12–113(a)(iv) does not state that the applicant cannot rely on other investors or partners to establish its financial capability and, in fact, refers to "financial resources." The plain meaning of "resource" is "a source of supply, support, or aid." *Merriam Webster Dictionary* 426 (2005). Investors and partners are, obviously, sources of supply, support or aid. If we were to interpret the statute as the objectors suggest, the applicant would have to show cash or other assets immediately available which seems untenable considering the scope and expense associated with wind energy development. We see no distinction between allowing an applicant to demonstrate it has an investor and allowing it to show that it can obtain credit to conduct the requisite activities. Those are "financial resources" which can be used to construct, maintain, operate, decommission and reclaim a facility. As we said earlier, the legislature's intent with regard to the financial assurance requirement is to ensure that the project will be properly reclaimed and decommissioned. Investors or partners can be resources to enable an applicant to comply with that legislative intent.

[¶ 71] Additionally, the legislature directed the ISC to promulgate rules

designed to provide adequate assurance that the permitted facilities will be properly reclaimed and decommissioned at the end of their useful life, upon revocation of a permit authorizing their operation or upon the happening of any event which causes operations to cease. The elements to consider when establishing adequate

levels of financial assurance shall include credit worthiness, financial strength, credit history, credit rating and any other factors that reasonably bear upon the decision to accept a financial assurance. The financial assurance may be in any form acceptable to the council and may include a corporate guarantee, letter of credit, bond, deposit account or insurance policy.

Section 35–12–105(e). This statute clearly indicates that adequate levels of financial assurance may include outside resources. Although the financial assurance rules were not finally promulgated when the application was filed in this case,[11] reading all of these statutes *in pari materia* in accordance with our standard of review convinces us applicants were allowed to provide financial assurances from outside sources. The ISC did not err by allowing Wasatch to present its financial resources information through Edison.

[¶ 72] The objectors next argue that even considering the Edison information, there was insufficient evidence to meet the financial assurances requirement, particularly adequate levels of credit worthiness, financial strength, credit history, and credit rating as required by § 35–12–105(e). Mr. Bhasin testified that Edison is a large company which produces power from different sources, including coal, natural gas and wind. It is one of the larger wind energy producers in the country and, in recent years, had financed $879 million in wind energy projects.

[¶ 73] Mr. Bhasin testified that Edison had entered into an option to purchase the project from Wasatch, and, although it intended to do so, it would not exercise that option until a permit had been issued. He testified, however, that Edison was not bound by its agreement with Wasatch. The evidence also established that Edison was experiencing financial difficulties as a result of lower power prices and the need to retrofit some of its coal-fired power plants to meet environmental standards. On cross examination, Mr. Bhasin admitted that Edison's credit rating was a B– due to the coal part of the

---

**11.** The ISC rules regarding financial assurances were adopted on May 31, 2011. ISC Rules, Chap. 1, §§ 9(p), 10(d).

business and the company's stock was considered to be "speculative" or "junk" by certain rating agencies.

[¶ 74] Christine Mikell, Wasatch's Development Director, testified that Wasatch's goal was to develop the project, obtain the permit and find an investor or buyer. She stated the process is standard in the wind development industry and, in fact, Wasatch and Edison had already developed a wind project in Utah using the same type of process. Ms. Mikell testified that Wasatch had obtained a twenty-year power purchase agreement with Rocky Mountain Power to sell the power generated by the Pioneer Wind Park project. In addition, she stated that Wasatch had already spent approximately $12 million developing the project, which included obtaining leases, the required surveys and analyses, a security deposit to Rocky Mountain Power for the power purchase agreement, and security deposits for the wind turbines. Edison and Wasatch also committed to post a surety bond prior to construction for decommissioning and reclamation of the project site.

[¶ 75] The record, therefore, contained conflicting evidence as to whether Edison had sufficient financial resources and the ISC had concerns about the fact that Edison was not "contractually bound to exercise its option to purchase the Projects." Consequently, it included Special Condition #19 in the permit and ruled that, with the condition, Wasatch was entitled to a permit under § 35–12–113. Given the ISC did not find that the financial assurance evidence was sufficient at the time of the hearing, the dispositive question here is not whether there was substantial evidence to support a finding that Wasatch had sufficient resources, but rather whether the ISC had the authority to grant the permit subject to the condition that the permittee provide further assurances prior to construction.

[¶ 76] Section 35–12–113(a) refers repeatedly to the ISC's authority to condition permits, allowing it to grant a permit "upon terms, conditions or modifications of the construction, operation or maintenance of the facility as the council deems appropriate" and "as proposed or as modified by the council." The authority for imposing conditions is broad even allowing the ISC to impose a condition requiring the location of "all or part of the proposed facility [to] be modified." Section 35–12–113(c). Other provisions of the Industrial Siting Act also refer to permit conditions. *See* Wyo. Stat. Ann. § 35–12–106(a) (industrial facilities must be constructed in conformity with a permit and any terms and conditions of the permit); Wyo. Stat. Ann. § 35–12–110(c) (other state agencies can recommend conditions to include in a permit). Despite the numerous references to conditioning permits, the objectors claim the ISC was required to find that the financial assurances were in place prior to issuing the permit.[12] If their argument were correct, the statutory language allowing the ISC to condition permits would be meaningless. A basic tenant of statutory construction is that we do not interpret statutes in such a way to render any portion meaningless. *Stutzman v. Office of Wyo. State Engineer,* 2006 WY 30, ¶ 16, 130 P.3d 470, 475 (Wyo.2006); *K.P. v. State,* 2004 WY 165, ¶ 22, 102 P.3d 217, 224 (Wyo.2004).

[¶ 77] We have previously described the general purpose of the Industrial Siting Act as "to protect Wyoming's environment and the social and economic fabric of its communities from the mischiefs resulting from massive, unregulated industrial development." *City of Evanston v. Griffith,* 715 P.2d 1381, 1384 (Wyo.1986). *See also Industrial Siting Council v. Chicago and North Western Transportation Co.,* 660 P.2d 776, 784 (Wyo. 1983). In order to meet that purpose, the Act specifically allows the ISC to condition permits on a developer's agreement to employ measures to mitigate the impacts of the project. *Id. See also* J. Van Baalen, Industrial siting Legislation: The Wyoming Industrial Development Information and Siting Act—Advance or Retreat? 11 Land & Water L.Rev. 27, 32–33 (1976). This is con-

---

**12.** Interestingly, the objectors do not seem to challenge the ISC's authority to condition permits regarding the other requirements of § 35– 12–113(a), including the environment, economic and social conditions, and health, safety and welfare.

firmed by ISC Rules, Chap. 1, § 9 (1997):[13] "The Council shall either grant or deny the application as filed, or grant it upon terms, conditions or modifications of the construction, operation or maintenance of the industrial facility as the Council deems appropriate." *See generally Mule Shoe,* ¶ 11, 252 P.3d at 954 (discussing deference to an agency's interpretation of its rules). The clear language of the statutes and regulations, therefore, allows the ISC to condition permits in order to protect Wyoming's environment and the social and economic fabric of the communities.

[¶ 78] In *Laramie River Cons. Council v. Industrial Siting Council,* 588 P.2d 1241 (Wyo.1978), we addressed the ISC's authority to condition permits, albeit under different statutory language. The statute existing at the time gave the ISC options of issuing a permit with no conditions; issuing a permit conditioned upon the commencement of construction within a reasonable time; issuing a permit "conditioned upon specified changes in the application; or [ ][r]ejecting the application pending further study" if the applicant was not able to demonstrate that the requirements for issuance of a permit had been met. *Id.* at 1245–46. The Laramie River Conservation Council claimed the ISC violated the statute by granting a permit for an electric plant with conditions which required further study and mitigation of social, economic, health, safety and welfare concerns, rather than denying the permit and requiring further study. *Id.* at 1250–56.

[¶ 79] This Court rejected Laramie River Conservation Council's argument that the ISC had to deny the application and require further study, stating Laramie River's interpretation was contrary to the agency's interpretation of its charge, the clear statute did not state that such denial was required, and Laramie River's interpretation would deprive the ISC of its statutory discretion to grant permits with conditions. *Id.* at 1250. We further held that the conditions did not act as an inappropriate substitute for the requirement of showing no serious injury to the listed interests. Instead, "[t]hese conditions constitute an effort by the [ISC] to encompass remedies for contingencies within the application ... which, if the conditions developed, could be relied upon by the [ISC] in the exercise of its authority and responsibility to monitor the operations." *Id.* at 1251. This Court concluded, therefore, the ISC's decision complied with the law and stated that granting the permit with conditions was "an appropriate way to resolve certain areas in which absent such a commitment the [ISC] might be concerned as to the potential for injury to the inhabitants ..." *Id.* at 1255. While the *Laramie River* decision did not address the financial assurance requirement, it can be interpreted as allowing permits to include conditions pertaining to the requirements for granting a permit under § 35–12–113(a). We conclude, therefore, that the clear statutory language and our precedent allowed the ISC to issue the permit subject to the financial assurance condition.[14]

[¶ 80] Special Condition # 19 in Wasatch's permit requires the permittee to provide, prior to the commencement of construc-

**13.** Chap. 1 of the rules was revised, effective May 31, 2011, several months after Wasatch filed its application in February 2011. Compare ISC Rules, Chap. 1 (1997) and ISC Rules, Chap. 1 (2011). This provision is currently found in Chap. 1, § 12 (2011).

**14.** This holding also resolves the objectors' argument that the ISC's decision was arbitrary and capricious because it granted the permit in violation of § 35–12–113(b) which states that "[n]o permit shall be granted if the application is incomplete." The objectors' specific argument is that, because Wasatch did not provide the requisite financial assurances, the application was incomplete and had to be denied. The record demonstrates that the ISD reviewed the application, issued a notice of deficiency asking for more financial information, and, after receiving Wasatch's response, determined the application was complete. The objectors equate a "complete" application with an application that should be granted. Clearly, the requirement of a complete application pertains to the applicant's responsibility to provide all information requested by the application process; the ultimate decision as to whether the application meets the statutory requirements for granting a permit is, however, left to the ISC. Otherwise, there would be no need for the two-step process. Compare, § 35–12–109 and § 35–12–113. The ISC did not act arbitrarily or capriciously by determining the application was complete, but imposing the financial assurances condition as part of the permit approval process.

tion, evidence acceptable to the ISC showing that it has obtained sufficient financial resources to construct, maintain, operate, decommission and reclaim the facility. Although the objectors claim the condition is not sufficiently definite, it clearly meets the mandate of § 35–12–113(d) which simply requires issuance of "the permit embodying the terms and conditions in detail." By directing the permittee to provide adequate information and obtain further ISC approval prior to construction, Special Condition # 19 protects the state from the injury that could result if a permittee started construction and was financially unable to finish the project. It also limits the amount of time the permittee has to comply by stating that if "sufficient financial resources are not obtained within two years, the Permit shall expire." By including the two year deadline, the ISC ensured the project would not be delayed indefinitely. In addition, the permittee will be obligated under Condition # 15 to furnish, prior to the start of construction, a surety bond or similar security of over $18 million dollars for decommissioning and reclamation of the project, thereby providing additional financial assurance.

[¶ 81] Finally, the objectors suggest that due process is somehow thwarted by the ISC's imposition of a condition and later determination outside of the contested case hearing process as to whether that condition has been met. This argument is misplaced. The ISC is governed by the Wyoming Public Meetings Act which requires it to conduct all business in "public meetings, open to the public at all times." Wyo. Stat. Ann. § 16–4–403(a) (LexisNexis 2011). Thus, the ISC's ultimate determination as to the sufficiency of the permittee's financial information will be made in public. ISC Rules Chap. 2, § 4 allows persons to petition the ISC for a hearing on any "action, decision, order or permit." Sufficient process is, therefore, available to the objectors to contest a future ISC finding regarding the permittee's financial assurances.

### 2. Threat of Serious Injury

[¶ 82] Section 35–12–113(a)(ii) states: "the council shall grant a permit either as proposed or modified by the council if it finds and determines that ... [t]he facility will not pose a threat of serious injury to the environment nor to the social and economic condition or inhabitants or expected inhabitants in the affected area." The objectors claim the ISC erred by determining that Wasatch had met this permit requirement.

#### a. Affected Area

[¶ 83] The objectors assert that Wasatch did not properly study the "affected area" to determine the threat of serious injury. The precise term "affected area" is not defined by statute; however, the ISC Rules provide insight into the meaning of "affected area" in the context of the risk of serious injury.

[¶ 84] ISC Rules Chap. 1, § 2 (1997) stated in relevant part:

(b) "Area or local government primarily affected by the proposed industrial facility" means:

(i) Any defined geographical area or unit of local government or special district in which the construction or operation of the industrial facility may significantly affect the environment, population, level of economic well-being, level of social services, or may threaten the health, safety or welfare of present or expected inhabitants.

(c) "Areas of site influence" means the areas which may be affected environmentally, socially, or economically, in any significant degree, by the location of the industrial facility at the proposed site. A separate "area of influence" may be considered for each resource identified in Section 7(i) of these rules.[15]

(footnote added).

[¶ 85] Chapter 1, § 7 (1997) of the rules set forth the pertinent requirements for the application:

Section 7. **Application information to be submitted.** In accordance with W.S.

15. The revised rules include the following definition which was not in effect at the time Wasatch filed its application: "(af) 'Study Area' is the geographic and political boundary, as designated by the administrator for the required governmental, social, and economic studies required for applications." ISC Rules, Chap. 1, § 2(af) (2011).

35–12–109, the application shall contain the information required by the act with respect to both the construction period and online life of the proposed industrial facility and the following information the council determines necessary: . . .

(b) A description of the specific, geographic location of the proposed industrial facility. The description shall include the following:

(i) Preliminary site plans at an appropriate scale indicating the anticipated location for all major structures, roads, parking areas, on-site temporary housing, staging areas, construction material sources, material storage piles and other dependent components;

(ii) The area of land required by the industrial facility and a land ownership map covering all the components of the proposed industrial facility.

. . . .

(g) The applicant shall identify what it deems to be the area of site influence and the local governments primarily affected by the proposed industrial facility as defined in sections 2(b) and (c), respectively, of these regulations. The immediately adjoining area(s) and local governments shall also be identified with a statement of the reasons for their exclusion from the list of area(s) or local governments primarily affected by the proposed industrial facility.

. . . .

(i) An evaluation of the social and economic conditions in the area of site influence. The social and economic conditions shall be inventoried and evaluated as they currently exist, projected as they would exist in the future without the proposed industrial facility and as they will exist with the facility. Prior to submitting its application, each applicant shall confer with the administrator to define the needed projections, the projection period and issues for socioeconomic evaluation. The evaluation may include, but is not limited to:

(i) Land use designation of the site location, including whether or not the use of the land by the industrial facility is consistent with state, intrastate, regional, county and local land use plans, if any. The analysis shall include the area of land required and ultimate use of land by the industrial facility and reclamation plans for all lands affected by the industrial facility or its dependent components;

(ii) A study of the area economy including a description of methodology used.

. . . .

(j) An evaluation of the environmental impacts. The items shall be noted and evaluated as they would exist if the proposed industrial facility were built. Each evaluation should be followed by a brief explanation of each impact and the permit issued that regulates the impact. If the impact is not regulated by a state regulatory agency or federal land management agency, the application must including plans and proposals for alleviating adverse impacts. Cumulative impacts of the proposed industrial facility and other projects in the area of site influence should be addressed separately.

(k) The applicant shall describe the procedures proposed to avoid constituting a public nuisance, endangering the public health and safety, human or animal life, property, wildlife or plant life, or recreational facilities which may be adversely affected by the proposed facility, including:

(i) Impact controls and mitigating measures proposed by the applicant to alleviate adverse environmental, social and economic impacts associated with construction and operation of the proposed industrial facility;

(ii) Monitoring programs to assess effects of the proposed industrial facility and the overall effectiveness of impact controls and mitigating actions.

ISC Rules, Chap. 1, § 9 (1997) [16] governed the ISC's decision and stated in relevant part:

(b) Threat of serious injury. In order to find that the industrial facility does not pose a threat of serious injury, the Council must find that the granting of a permit will

**16.** This provision is currently located at ISC Rules, Chap. 1, § 12(c) (2011).

not result in a significant detriment to, or significant impairment of, the environment or the social and economic condition of present or expected inhabitants.

(i) "Environment" shall mean the physical conditions existing within the affected area, including, but not limited to, land, air, water, minerals, flora, wildlife, noise, and objects of historic, aesthetic, or recreational impacts over which the Council has jurisdiction.

. . . .

(iii) In determining whether the proposed industrial facility poses a threat of serious injury to the economic condition of the present or expected inhabitants, any net deterioration of a material nature in the condition of either present or expected inhabitants will be weighed negatively. "Economic conditions" may include, but is not limited to, the following factors:

(A) Upgrading of jobs and increased income;

(B) Family and per capita income;

(C) Unemployment and underemployment rates within the area of site influence;

(D) Purchasing power of earnings within the area of site influence;

(E) Short-term and long-term fluctuations in resource consumption and resource availability;

(F) Employment dislocation and skill obsolescence;

(G) Employment opportunities;

(H) Diversity of economy and stability of various segments of the economy[.]

[¶ 86] The ISC noted that the ISD "determined the area primarily affected is a polygon that includes the Project site, the municipalities of Douglas, Rolling Hills, Glenrock, Evansville, Bar Nunn, Mills and Casper and inclusive areas of Converse and Natrona County." The objectors seem to argue that this entire area should have been considered the "affected area" in determining whether the project posed a threat of serious injury to any of the interests addressed in § 35–12–113(a)(ii), i.e., the environment and social and economic condition. In other words, they argue that the area which must be studied

for all interests is static and should have included the entire polygon identified as the area primarily affected by the ISD staff. This interpretation ignores many other portions of the rules.

[¶ 87] Chap. 1, § 2(b) defined area "primarily affected" as "any defined geographical area" "in which the construction or operation of the industrial facility may significantly affect the environment, population, level of economic well-being, level of social services, or may threaten the health, safety or welfare of present or expected inhabitants." This definition specifically listed the different interests that may be affected by a project, such as environment, population, economic well-being, etc., and indicated that they may have differing "affected areas." The provision also used the term "significant" demonstrating that each interest should be evaluated separately to determine if the project's effect on that interest is "significant" or not.

[¶ 88] Similarly, subsection (c) of Chap. 1, § 2, indicated that there may be separate "areas of site influence" for the various interests and, again, required a degree of significance to qualify. Notably, that section also specifically stated that a separate "area of influence" may be considered for each interest or "resource" identified in Section 7(i), which included the social and economic conditions. The fact that the definition of area of site influence differentiated between the various interests and required a significant degree of impact confirms that the pertinent area may change based upon the type of interest affected. There are material differences between environmental, social and economic interests. The environmental impacts will necessarily occur closer to the actual facility; while, the social and economic impacts may stretch further to populated areas. The rules recognized the need to examine the interests individually to determine the proper scope of site influence.

[¶ 89] Section 7(i) required evaluation of the social and economic impacts of the project and directed the applicant to "confer with the administrator to define the needed projections, the projection period and issues for socioeconomic evaluation." This provision clearly allowed the scope of the social

and economic evaluations to be honed to reflect the areas that are actually impacted. Similarly, § 7(j) provided flexibility in determining the scope of the environmental evaluation and referred to interaction with other agencies to determine such impacts. Likewise, Chapter 1, § 9, which pertained to the ISC's decision referred to significant or substantial impairment or detriment to different interests, confirming that impact should be evaluated in the area appropriate for that interest.

[¶ 90] The clear language of the statutory and regulatory provisions did not require an evaluation of all resources over the entire polygon-shaped area identified as primarily affected by ISD. It was appropriate for the ISC to allow evaluations of different affected areas for individual interests.

### b. Environment

[¶ 91] The objectors argue the record does not contain substantial evidence to support the ISC's determination that the project would not pose a threat of serious injury to the environment. They claim Wasatch should have extended its study area for various types of wildlife, largely because Wasatch revised its application shortly before the hearing to move some of the turbines closer to the eastern boundary of its environmental study area. The record shows that Wasatch consulted extensively with the Wyoming Game and Fish Department regarding the survey protocols, conducted the surveys and presented them to the ISC as part of the permit process. Wasatch also consulted with the U.S. Fish and Wildlife Service and, because of that agency's concerns about raptors, it added additional surveys.

[¶ 92] Richard Spencer Martin, the Senior Project Development Manager and in-house environmental expert for Wasatch, testified at the hearing regarding the wildlife surveys conducted by SWCA Environmental Consultants. The study area is identified on various maps in the record and included the area of actual development, together with additional areas depending on the species being studied. For example, golden eagles

and raptors were studied in the project area and, on recommendation from the wildlife agencies, they were also studied outside of the project area—golden eagles by four miles and other raptors by two miles. As a result of the surveys, Wasatch revised the site plan to avoid a high raptor concentration area. The Game and Fish Department reviewed the revised site plan which showed the relocation of some of the turbines and indicated it did not change that agency's recommendations. Game and Fish Department representative Mary Flanderka also testified at the hearing and confirmed that the movement of the turbines did not mandate adding to the study area.

[¶ 93] The objectors called Hamilton Smith, an ecologist with the environmental consulting firm, Biota Research Consulting, to testify at the hearing. He stated that he had reviewed Wasatch's application and other relevant documents. He was concerned with the methodology employed by SWCA to monitor wildlife movement and habits. For example, he indicated the raptor monitoring points should have been closer together, the study area should have been larger, and the surveys should have been conducted more evenly throughout the seasons.

[¶ 94] The ISC was the trier of fact and, as such, had the responsibility to resolve issues of witness credibility and weigh the evidence. _See, e.g., Dorr v. Wyo. Bd. of Certified Public Accountants_, 2006 WY 144, ¶ 33, 146 P.3d 943, 957 (Wyo.2006). It sifted through the evidence and, specifically referencing the testimony of Martin and the Game and Fish representatives as support for its decision, stated that Wasatch had shown that the proposed project would not "pose a threat of serious injury to the environment...." With regard to the impact on the biological and wildlife resources in the area, the ISC rejected Mr. Smith's testimony in favor of Ms. Flanderka's. As part of its determination that Wasatch's project would not pose a threat of serious injury to the environment, the agency necessarily concluded the study area was adequate.[17] Although

---

17. To further protect the environment, the Wasatch's permit includes Special Condition # 16:

Before the start of construction of each segment of construction—Pioneer Wind Park I

the evidence was conflicting, the record clearly contained relevant evidence which a reasonable mind might accept in support of the agency's conclusion. *Dale*, ¶ 11, 188 P.3d at 558–59.

### c. Social and Economic Condition

[¶ 95] The ISC determined that Wasatch's project "will not pose a threat of serious injury ... to the social and economic condition or inhabitants in the affected area." § 35–12–113(a)(ii). The objectors claim this finding is not supported by substantial evidence. In particular, they assert the record demonstrates the project poses a threat of serious injury to property values and the historic use and preservation of properties adjacent to the project.

[¶ 96] The ISD determined the appropriate study area for the socioeconomic analysis was Converse and Natrona counties, with inclusive municipalities. Wasatch engaged Blankenship Consulting, LLC to conduct a socioeconomic assessment of its project which was included in the application, and George Blankenship, the principal of the firm, testified at the contested case hearing. Mr. Blankenship studied the existing conditions and potential effects of the project on various socioeconomic conditions such as work force, land use, tax revenues, and public facilities and services. He concluded the benefits of the project were significant, while the potential negative impacts were minimal and the project would not pose a threat of serious social or economic injury to the current or expected inhabitants of the area. He did not, however, conduct an analysis of the impact of the project on individual property values in the area of the project.

[¶ 97] The objectors called some area landowners, including Ms. Hornung, Grady Gaubert and Bret Frye, who testified that

the project would adversely impact the view shed and, consequently, property values. Mr. Lay, owner of the White Creek Ranch, also testified on behalf of the objectors and stated that he believes the project will cause serious injury to his property, especially in light of the fact that it is listed on the National Register of Historical Places. He further indicated the project would change the character of the area from recreational to industrial.

[¶ 98] A real estate appraiser from Wisconsin, Kurt Kielisch, also testified for the objectors. He did not appraise the affected properties, but he did prepare a property value impact report which was submitted as an exhibit at the hearing. In preparing his report, he conducted a literature study about the perceptions of wind energy projects, including their effect on property values in different parts of the country and the world; reviewed the project; and surveyed eleven Wyoming individuals, including four realtors, four appraisers and three landowners with property near the projects. He concluded that if the project were allowed, the highest and best use of the surrounding property would be changed from recreational to agricultural, resulting in a devaluation of 40% to 71%.

[¶ 99] During the rebuttal portion of its case, Wasatch called Neal Hilston, a Wyoming appraiser and real estate broker and one of the persons interviewed by Mr. Kielisch. Mr. Hilston stated that Mr. Kielisch's report misrepresented some of the comments he made during the interview. He criticized the Kielisch report because it did not include analysis of wind projects in Wyoming or neighboring states, but relied, instead, on information from Europe and the eastern part of the United States. Mr. Hilston also stated that he had actually appraised six or seven ranches that were located next to

and Pioneer Wind Park II—Permittee shall provide the second year survey of wildlife to ISD. The Director may authorize the start of construction of the segment on a favorable recommendation by the Wyoming Game and Fish Department. . . .

In addition, Condition # 5 allows the ISC to review any adverse social, economic, or environmental impacts from the project which were unforeseen when the permit was granted and

require additional mitigation measures to address the impacts. The record includes evidence about the formation of a Technical Advisory Committee (TAC) which will include the wildlife agencies, DEQ, landowners and the permittee. The TAC will evaluate the post-construction monitoring data on an annual basis to determine if there are adverse wildlife impacts and develop appropriate mitigation measures if needed.

properties with wind farms and he did not see any effect from the wind farms on the values of the adjoining properties, although he admitted there was not much information available.

[¶ 100] The ISC determined the projects would not pose a threat of serious injury to the social and economic condition or inhabitants of the affected area. It accepted Mr. Hilston's testimony over Mr. Kielisch's "regarding the effect of the wind farm on property values" because Mr. Hilston "was familiar with the unique characteristics of the residents of Wyoming and area surrounding the Projects. Mr. Kielisch's report was based upon information from areas distant to Wyoming." The ISC properly weighed the conflicting evidence and determined that the evidence pertaining to property values did not establish a threat of serious injury to the economic condition of the area. There is substantial evidence in the record to support its determination.

[¶ 101] The ISC also correctly kept in mind that the Industrial Siting Act is primarily "concerned with the question of acceptability of various impacts" and does not require the virtual elimination of all impacts. *Laramie River*, 588 P.2d at 1249. That approach is made clear in the statutory provision requiring denial of a permit only if it will pose a threat of **serious** injury to the social and economic condition or inhabitants. Section 35–12–113(a)(ii) (emphasis added). Likewise, the statutes and regulations did not include the effect on individual property values as one of the factors requiring economic analysis. We recognized the community based focus of the Industrial Siting Act when we stated in *Laramie River*, 588 P.2d at 1253: "[The] Industrial Siting Council is to be concerned with the collective not individual welfare of the present and expected inhabitants." While certain inhabitants may suffer a detriment because of the location of the project, the ISC decision "must be based upon a balancing of the interests of all the inhabitants of the area, not simply upon the interests of one segment of the inhabitants." *Id.* at 1254.

[¶ 102] Although individual property value concerns are not part of the required

analysis, ISC Rules, Chap. 1, § 9(b)(iii) stated the ISC was not limited to the listed factors, meaning there was no legal impediment to consideration of such evidence in the particular way it was done in this case, i.e., considering it but not placing individual interests over the collective interest. In fact, the ISC addressed the Hornungs' view shed objections by attaching Special Condition # 20 to Wasatch's permit, requiring it to negotiate in good faith with the Hornungs to find a means to mitigate the visual and potential audio impacts of the project on them, such as using vegetative screening. The ISC's decision that the project would not pose a threat of serious injury to the social and economic condition or inhabitants in the affected area under § 35–12–113(a)(ii) was informed and is supported by relevant evidence a reasonable mind might accept in support of the agency's conclusion.

## CONCLUSION

[¶ 103] In the Converse County case, Case No. S–12–0060, we agree with the district court that White Creek Ranch, as an adjacent landowner, has standing to appeal the Board's decision because it asserted the project threatened its scenic views and wildlife habitat and migration, interests which are sufficient under *Northfork*. We disagree with the district court regarding NLRA and conclude that it has standing through its members to appeal. NLRF, however, does not have standing; its claims are simply too general and speculative to separate its asserted injury from that of the general public. We also hold that the arbitrary and capricious standard is appropriate for our review of the Board's decision, given the administrative process was an informal public hearing. On the merits, we conclude the Board did not act arbitrarily or capriciously by determining Wasatch had presented sufficient traffic study and financial assurance information. In addition, the proper notifications were provided and the objectors were not denied due process of law. We, therefore, affirm in part and reverse in part the district court's decision in Case No. S–12–0060.

[¶ 104] In the ISC case, Case No. S–12–0061, we conclude the ISC was not required

to rely solely on Wasatch's individual financial resources, but could consider the financial evidence relative to its proposed investor, Edison. The ISC also properly conditioned Wasatch's permit by requiring additional financial assurance prior to commencement of construction. The agency did not err in allowing Wasatch to evaluate different "affected areas" for the various interests identified in the statutes. Finally, the record contains substantial evidence to support the ISC's conclusion that Wasatch's proposed facility will not pose a threat of serious injury to the environment or to the social and economic condition or inhabitants in the affected area. We, therefore, affirm the district court's decision in Case No. S–12–0061.